EDWARDS, Judge.
This is an action by an insured against its insurer, seeking recovery under the insurance policy. Defendant appealed the trial court judgment in favor of plaintiff, contending (1) that plaintiff had not established that the insurance policy covered the claimed loss, and (2) that the amount of loss claimed was excessive and unsubstantiated.
The policy of record did not cover the claimed loss, but both parties alluded to the existence of an endorsement which did cover the loss. We remanded to allow plaintiff to introduce the endorsement. Balehi Marine, Inc. v. Firemen’s Insurance Co., 460 So.2d 16 (La.App. 1st Cir.), cert. denied, 462 So.2d 654 (La.1984). On remand the parties stipulated that the insurance policy covered the claimed loss, and the case is before us now solely on the issue of damages.
The claim arose out of an accident on November 17, 1980, at Balehi’s shipbuilding facility which resulted in the destruction of a forty-foot by sixty-foot section of a steel building. Balehi immediately notified Firemen’s of the loss, and Firemen’s claim representative met with Balehi’s representatives for an on-site inspection of the damage and to discuss the repair and restoration of the building.
The damage caused a virtual shut-down of the shipbuilding operations, and the parties agreed that it was essential to make the repairs as quickly as possible so as to get the shipyard back in operation. With that goal in mind Balehi offered to use its crew and equipment to do the repair work. Clarke Harper, Firemen’s adjuster told Bal-ehi to proceed with the work.
Balehi repaired the damage and sent a bill to Firemen’s for $60,550.42. Upon receiving the bill, Mr. Harper secured from other contractors estimates totaling $29,-344.75 for the cost of the repair. He then subtracted the $1,000 deductible and forwarded a draft to Balehi in the amount of $28,344.75 for full payment of the claim. Balehi rejected the draft and filed this suit.
On November 19, Mr. Harper and Marvin Brosset, the insurance agent who sold Bal-ehi the policy, met with Dennis Franz, then treasurer (and now vice president) of Bal-ehi, and David Levy, chairman of the board. Both parties agree that Mr. Harper advised the Balehi representatives to get started on the job of repairing the damage. The exact terms of the agreement, however, are in dispute.
Mr. Franz testified that when Harper asked how much damage had been done, he said in the area of $100,000 to $105,000. According to Franz, they agreed that Bal-ehi would do the work for $20 per man hour. Materials were to be Balehi’s actual cost plus 20%. Balehi was to use its own equipment in the demolition and construction operation at no additional cost.
David Levy testified that they discussed price at the meeting and decided that Bal-ehi could do the job as cheaply as anyone else since they were on-site and therefore would not have to pay for travel from New Orleans for the workers. Levy testified *1362 that he had estimated the damage to be $100,000 to $180,000 but that that was merely a guess. No one, he said, could suggest an exact figure because of the sophistication of the repairs necessary. He also testified that they agreed on $20 per man hour for regular time and $30 per man hour for overtime and that the materials would be cost plus 20%. Levy also testified that he told Harper and Brosset to look at the records but that they never did. At one point he told them, “You should be checking these figures so that we don’t have a problem down the road.”
Mr. Brosset testified that he remembered that Balehi wanted to get the repairs done quickly but that he did not remember the actual agreement. He remembered a discussion of figures, and when he left he was under the impression that Balehi was going to do the work. Nonetheless he did not think that any agreement was ever reached that Balehi would do it as cheaply as any other construction company.
Mr. Harper admitted that he told Balehi to begin the work, but added he thought it was clear that it was provided Balehi could do the job at no greater cost than someone else. He said that he certainly did not want to pay labor rates for shipfitters and welders to do demolition, but that no agreement was ever reached as to price. Harper said that the $100,000 to $180,000 figure was mentioned when he was first told of the loss in his New Orleans office but he recalled no further discussion of it. According to Harper, no figures were mentioned on the scene with the Balehi people.
After talking with the Balehi representatives, Mr. Harper contacted Edward Ludwig, Jr., for a bid on doing a portion of the repair work. Mr. Ludwig told him his work would be less than $20,000. Balehi ultimately sub-contracted that portion of the job to Mr. Ludwig and his bill was $15,800. Aside from the Ludwig estimate, however, Harper secured no other estimates until he got the bill from Balehi.
Harper then sent photographs of the damage and descriptions of the building to contractors to get estimates. He arrived at his final figure by adding what he called firm quotes from four different companies, the invoice price of the Ludwig sub-eon-tract work, and the invoice price for steel from Balehi. No written estimates, however, were introduced into evidence, and the only contractor who testified was Mr. Robert Haase. His estimate was to construct the mezzanine section of the building for $10,761.00. Accepted as an expert witness, Haase also testified that he would have done the entire repair job, including the demolition of the damaged building sections, the rebuilding of the main building and the building of the mezzanine for $31,-000. This $31,000 estimate, however, did not include the removal of the contents of the building. Nevertheless, Mr. Haase never actually saw the damage. He made his estimates from photocopies of photographs and from building descriptions given him by Mr. Harper.
The trial court found that there was an agreement for Balehi to do the work with its crew at $20 per man hour regular time and $30 per man hour overtime, and that Balehi would charge its cost plus 20% for materials. Thus the court made its credibility determination in favor of Balehi and against Firemen’s. The factual conclusions of the trial court must be given great weight by the reviewing court. Roussel v. Colonial Sugars Co., 318 So.2d 37, 39 (La. 1975). We cannot say that these findings are clearly wrong. See Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978).
Furthermore we agree with the trial court’s conclusion that Balehi did prove by a preponderance of the evidence that the cost of the repair was $60,550.42. Firemen’s complained that Balehi charged about as much to demolish the building and remove its contents as it did to actually rebuild the damaged structure. Mr. Ludwig testified that because the building was twisted it was hard to take down, harder than regular demolishing. He said it would probably take longer to take it down than it would to build it. In addition before the mezzanine was removed the contents had to be removed. Mr. Ludwig did not think it unreasonable that Balehi charged *1363 more for taking down the building than for the rebuilding job itself.
That part of the trial court judgment awarding penalties and attorney’s fees is also affirmed. Failure to pay an insurance claim within sixty days after being furnished satisfactory proof of loss, upon being found to be arbitrary, capricious, or without probable cause, subjects the insurer to a 12% penalty and reasonable attorney’s fees. LSA-R.S. 22:658.
When there is a reasonable dispute as to the amount of the loss, the insurer can avoid penalties and attorney’s fees by unconditionally tendering the undisputed amount. Sibley v. Insured Lloyds, 442 So.2d 627, 632 (La.App. 1st Cir.1983), (citations omitted). If, however, the insurer conditions its offer to pay the undisputed amount on the insured’s acceptance of it as full settlement, it is not a “tender” within the contemplation of LSA-R.S. 22:658, because it is not absolute and unconditional. O’Brian v. Allstate Insurance Co., 420 So.2d 1222, 1226-27 (La.App. 3d Cir.1982); Gagnard v. Travelers Insurance Co., 380 So.2d 191, 195-96 (La.App. 3d Cir.1980).
Balehi mailed its claim to Firemen’s on January 15, 1981. Firemen’s mailed the draft for $28,344.72 on March 18 or 19, just within the sixty day time period. Nonetheless the draft was conditioned on its being full settlement of the claim. Thus no tender was made within the contemplation of LSA-R.S. 22:658, and Firemen’s is liable for penalties and attorney’s fees on the entire amount.
Balehi complied with the terms of its insurance contract by submitting a written claim immediately after the damage occurred. Balehi’s repair records were open to Firemen’s, and Balehi even suggested that Firemen’s examine those records during the course of the repair so that there would be no problems later on.
The amount of attorney’s fees is within the discretion of the trial judge. Moore v. Millers Mutual Fire Insurance Co., 406 So.2d 708, 712 (La.App.2d Cir. 1981), cert. denied, 410 So.2d 1132 (La.1982). Although plaintiff did not present any evidence regarding the number of hours spent by counsel or the actual legal costs incurred, we believe the award of $7,500 in attorney’s fees is not unreasonable in light of the amount in dispute, the expertise of the trial attorney, the one day trial and the time that would be necessary for trial preparation.
Balehi answered Firemen’s appeal and requested additional attorney’s fees to compensate itself for defending the appeal.* Plaintiff is entitled to such an award. Sibley v. Insured Lloyds, 442 So.2d at 633. Originally this court was seriously concerned about the matter of coverage. This is a dispute between an insured and its own insurer over damage to the insured’s property. Their relationship was based on contract, not tort. In order to insure that justice prevailed we remanded to the trial court solely for the purpose of determining that this claim was or was not covered by the insurance policy. Following that, the defendant applied for writs to the Supreme Court, which were denied.
Then, when the matter was back before the trial court, the parties entered into a very plain stipulation which clearly said that this loss was covered. There have been further disputes at the trial court level concerning the award vel non of attorney’s fees to the plaintiff for answering the defendant’s appeal.
We are at some difficulty to understand the prolonged dispute in this case over coverage. The issues that have heretofore gone to the Supreme Court and back to the trial court did not address the correctness of the award, only the question of cover *1364 age. Now we find that there is no dispute about coverage. It has been stipulated. We have affirmed the trial judge’s decision on the amount involved for the reasons which we have heretofore given.
Addressing ourselves now to the issue of the additional attorney’s fees that the plaintiff is entitled to for the work which has been involved in the appeals, we conclude that an additional award of $5,000 is justified under the circumstances, legal interest thereon to run from the date of this opinion until paid. Costs of both appeals are assessed against appellant.
AFFIRMED.
LANIER, J., dissents from the amount of the penalty attorney fee for the appeals in this case with reasons, but otherwise agrees with the opinion.

 On remand to the trial court Balehi introduced evidence on the issue of attorney’s fees for the appeal, and the trial judge granted $10,256.25. We had remanded solely for the purpose of allowing the introduction of the policy endorsement. The trial court was correct in subsequently concluding that it did not have jurisdiction over the appellate attorney’s fees question. Thus our determination of the amount of attorney’s fees is not a review of the trial court’s determination, but is rather a de novo ruling.