MAX N. TOBIAS, JR., Judge.
| ,The defendant/appellant, Pacific Insurance Company, Limited (“Pacific”),[1] has appealed a judgment in favor of the plaintiffs/appellees, Maloney Cinque, L.L.C. and Maloney Sept, L.L.C. (collectively hereinafter, “plaintiffs”), for (a) breach of contract and (b) violations Louisiana’s bad faith statutes related to the timing of insurance payments of proceeds on plaintiffs’ Hurricane Katrina-related claims for wind damage on their businesses.[2] For the reasons that follow, we affirm in part, reverse in part, amend the judgment in part, and render.
|2The plaintiffs own a number of truck stops in the New Orleans area, including the Mardi Gras Truck Stop (“the Mardi Gras”), located at 2411 Elysian Fields Avenue, and the Big Easy Truck Stop (“the Big Easy”), located at 5000 Old Gentilly Highway. Both businesses include fuel pumps, convenience stores, and video poker casinos. As a result of Hurricane Katrina, the properties were damaged from and by both flood and wind. It is undisputed that the flood waters reached a minimum of four feet at each location.
The plaintiffs filed suit against Pacific, arguing that, while the amounts due were paid under the policy, these amounts were not paid timely as required by law.[3] Trial was held in late May 2010. On 10 December 2010, the district court rendered judgment finding in favor of the plaintiffs for (1) $290,908 in extra business expenses, with interest from date of judicial demand; (2) consequential damages of $335,170 ($1,300,000 in lost profits less the policy’s coinsurance provision) with interest from date of judicial demand; and (3) statutory penalties of $939,109.50; and in favor of Pacific for the plaintiffs’ claims of (a) additional damages for business income loss; and (b) attorney’s fees. A motion for new trial was timely filed.
*17 On 3 February 2011, the trial court issued its written reasons for judgment. Specifically, the court stated:
While Pacific Insurance Company paid the amounts due under the policy, the evidence revealed that they failed to make many of the payments timely. For ¡.¡example: Those amounts that were due at various times under the policy were made in excess of 30 or 60 days from satisfactory proof of loss. Satisfactory proof of loss existed at the time Pacific Insurance Company’s own expert determined a value for the disputed losses. At that time, Pacific had an obligation to make payment of at least the amounts that they determined were due as a result of the loss.
Pacific Insurance Company also failed to make any payment on the extra-expenses coverage. With the exception of extra-expenses losses, the Court applied — at least to those profits that were lost as a result of the failure to be able to open earlier — the co-insurance penalty provision. Had the plaintiffs been able to cover those additional months of business loss, those amounts would have been reduced by their coinsurance penalty provision.
For these reasons, the Court granted consequential damages in the following amounts:
For Maloney Sept, LLC, the Court found the loss of profits to be $700,000.00; and using the coinsurance penalty provision, the Court assessed this at 27.25% for an amount of $190,720.00.
For Maloney Cinque, LLC, the Court found the loss of profits to be $600,000.00 and assessed 24.67% of that sum for a total loss of $144,420.00. As previously indicated, the Court made no such reduction for the extra-expenses loss.
As to damages under LSA-R.S. 22:1220 and 22:658, the Court assessed damages in the amount of 1.5 times the damages awarded. In calculating this amount, the Court added the sum of $290,903.00 (extra expenses) and the sum of $335,170.00 (combined lost profits) for a total of $626,073.00. By assessing the penalty at 1.5 times that amount, the Court arrived at the figure of $939,109.50. The Court found that the damages that were incurred were incurred prior to the August 15, 2006, effective date of the revision. Therefore, the Court assessed no attorney’s fees.
|4The court issued an amended and restated judgment on 3 March 2011 following a hearing on motions for new trial filed by both parties.[4] The court retained the award in favor of the plaintiffs in the amount of $290,903 for extra expenses, plus judicial interest from the date of judicial demand. With respect to the consequential damage award, “[f]inding the Defendant failed to pay within both 30 and 60 days of satisfactory proof of loss,” the court eliminated its prior application of the coinsurance penalty provision, and awarded $1,300,000 for lost profits, plus judicial interest from the date of judicial demand. Finally, with respect to statutory penalties, “¡Binding the Defendant failed to pay within both 30 and 60 days of satisfactory proof of loss,” the court awarded penalties in the amount of $2,386,354.50, “in accordance with the Written Reasons for Judgment issued on February 3, 2011.” Pacific timely appealed.
*18 Pacific has assigned five errors for review:
1. The district court erred in awarding consequential damages for lost profits.
2. The district court erred in awarding statutory penalties.
3. The district court erred in awarding interest on the consequential damage award from the date of judicial demand rather than from the date of judgment.
4. The district court erred in awarding contractual damages for extra expenses.
| y5. The district court erred in awarding statutory penalties under La. R.S. 22:1973 on the extra expense award.
We begin our analysis with the issue of whether Pacific made timely payments under the insurance contract and under applicable state law. If its payments were timely, then our analysis need go no further.
The record reveals the following time-line taken, in part, from the reports by Gary Steen (“Steen”), an independent adjuster with Axis International, Inc. (“Axis”), hired to adjust the claims for Pacific.[5] The reports were prepared by Steen and sent to Steven Karkos (“Kar-kos”), assistant claims manager with First State Management Group, Inc. (“First State”), of which Pacific is a part.[6] In addition, the timeline is taken from internal communications between Steen and First State as well as internal First State communications among the personnel responsible for adjusting plaintiffs’ claims.[7]
2005
• 29 August Hurricane Katrina strikes the New Orleans area.
• 16 September First notice of claim by plaintiffs to Pacific.
• 23 September First notice of claim by Pacific to Steen.
• 28 October Advance of $50,000 by Pacific for each property on wind-damage claim.
In* 31 October Madsen, Kneppers & Associates (“MKA”) hired by Pacific (through Axis) as construction consultants.
• 23 November Estimate of $1,467,853.17 to repair the Big Easy by Bruce Frazier of the Alliance Consulting Group, L.L.C. (“Alliance”) public adjusters hired by the plaintiffs; Matthew Adrian (“Adrian”) of Matson, Driscoll & Damico (“MDD”), forensic accountants, hired by Pacific (through Axis) to assist in the evaluation of the loss of business income (“BI”) claim.
• 28 November Letter from MDD to plaintiffs’ attorneys requesting financial information supporting the Mack report prepared by Kenneth Mack (“Mack”).[8]
• 14 December Estimates to repair the Mardi Gras by Alliance: an aggregate amount of $340,235.92 (comprising separate amounts of $283,379.89 + $51,497.42 + $5,358.61); estimate from MKA to repair the Big Easy of $715,764.87.
*19 • 18 December Actual Cash Values (“ACV”) repair cost analyses by MKA for plaintiffs’ properties.
• 21 December Estimate by MKA to repair the Mardi Gras of $321,002.80.
2006
• 17 January Letter from MDD to Mack requesting financial information supporting his report, similar to the 28 November 2005 letter.
• 23 January Authority requested to secure an ACV Proof of Loss for $865,827.87 with a Replacement Cost Coverage (“RCC”) Holdback of $288,135.01; plaintiffs provided a loss of BI claim to Adrian of MDD of $866,000; agreed at two-month period of restoration.
• 31 January Flood estimates for both properties completed by the flood insurer.
17* 17 February Report from MOD addressing the interim BI loss without application of coinsurance provision.
• 27 February Preliminary report from MDD with proposed BI claim for three months of $109,979, subject to coinsurance of 100 percent. Pacific advances an additional $75,000 per property for wind-damage.
• 28 February Letter from MDD to Mack requesting financial information supporting his report, similar’ to the 17 January 2006 letter.
• 1 March Large Loss Notice completed by Karkos and forwarded to a home office property consultant; internal email questions ACV in order to apply the 90% coinsurance.
• 8 March Letter from Steen to Alliance attaching preliminary report from MDD to show coinsurance penalty of 100% for loss of BI.
• 24 March Replacement Cost Values (“RCV”) from MKA for plaintiffs’ truck stops; coinsurance requirements not yet applied.
• 28 March Karkos confirms that Big Easy conforms to the 90% coinsurance requirement, but still needs ACV valuation for the Mardi Gras.
• 13 April Steen sends Alliance letter correcting values at risk for the properties; MDD report showing loss of BI for five months at $219,866.
• 17 April Email from Karkos to Steen advising that (1) Steen used incorrect values for the buildings that were damaged and (2) MDD should increase indemnity period for an additional three months (now eight months total).
• 18 April Karkos requests authority to settle the claims for wind damage to the properties.
• 9-10 May Pacific pays wind related property damage claims.
• 8 June Steen emails Alliance acknowledging receipt of signed and sworn ACV proofs of loss for building damage. Report from Steen to Karkos stating that the public adjuster was requesting payment of the 1 ¡^undisputed portion of BI loss; Steen requests authority to pay $144,866.
• 28 July Initial payments of $114,581 (the Mardi Gras) and $85,419 (the Big Easy) for loss of BI claims.
• 9 November MDD final report on loss of BI for both properties allowing an eight-month period of indemnity.
• 14 December Letter from Steen to Karkos transmitting the signed and notarized proof of loss for the replacement and cost holdbacks for the Big Easy.
2007
• 9 January Final payment of $298,317 for loss of BI claims for both properties.
2009
• 2 September Report by Mack recalculating the loss of BI and coinsurance per income statements for 31 July 2005, 31 December 2005, and 31 December 2006.
*20 In light of our timeline, we address the timing of the payments for wind-related damage to the buildings and loss of BI. We start with the wind-related losses.
Pacific contends that it could not have paid the wind-related loss claim any earlier than 17 April 2006, the date on which it had sufficient information to do so; therefore, the payments on 9 and 10 May 2006 were timely. On the other hand, the plaintiffs argue that Pacific had satisfactory proofs of loss on 13 and 18 December 2005, when MICA gave estimates to Pacific. Thus, the plaintiffs claim those May 2006 payments were untimely and prevented them from rebuilding in a timely manner and reopening sooner. We do not agree with either the plaintiffs or Pacific.
|nThe Pacific insurance policy issued to the plaintiffs states that one of the duties of the insured following loss or damage to the covered property is to “send a signed, notarized proof of loss” containing the information requested by Pacific to investigate the claim within 60 days after the insurer’s request. We do not find such a request from Pacific in the record for this claim.[9] However, we observe an email dated 1 March 2006 wherein Pacific acknowledges that it has prepared a “Large Loss Notice,” and requested authority to post a reserve, although the referenced document is not in the record. We assume that the Large Loss Notice addressed wind-related damages only, as the parties were still discussing the BI claim.
La. R.S. 22:658 provides, inter alia:
A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:656, R.S. 22:657, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.
[[Image here]]
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor, as provided in R.S. 22:658(A)(1), or within thirty days after written agreement or settlement as provided in R.S. 22:658(A)(2) when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-five percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, together with all reasonable attorney fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees for the prosecution and collection of such amount. |)n[Emphasis supplied.]
La. R.S. 22:1220,[10] cited in La. R.S. 22:658, provides in relevant part:
*21 A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer’s duties imposed in Subsection A:
[[Image here]]
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.
La. R.S. 22:658 A(l)’s prohibited conduct “is virtually identical to the conduct prohibited in LSA-R.S. 22:1220 B(5): the failure to timely pay a claim after receiving satisfactory proof of loss when that failure to pay is arbitrary, capricious, or without probable cause.” Reed v. State Farm Mut. Auto. Ins. Co., 1103-0107, p. 12 (La.10/21/03), 857 So.2d 1012, 1020, citing Calogero v. Safeway Ins. Co. of Louisiana, 99-1625, p. 7 (La.1/19/00), 758 So.2d 170, 174. These statutes are penal in nature and must be strictly construed. Id. “One who claims entitlement to penalties and attorney fees has the burden of proving the insurer received satisfactory proof of loss as a predicate to a showing that the insurer was arbitrary, capricious, or without probable cause.” Ullah, Inc. v. Lafayette Ins. Co., 09-1566, pp. 14-15 (La.App. 4 Cir. 12/17/10), 54 So.3d 1193, 1202. The plaintiff also has to show a lack of compliance within the applicable time periods. See La. R.S. 22:658 and La. R.S. 22:1220. “The phrase ‘arbitrary, capricious, or without probable cause’ is synonymous with ‘vexatious,’ and a ‘vexatious refusal to pay’ means ‘unjustified, without reasonable or probable cause or excuse.’” Louisiana Bag Co., Inc. v. Audubon Indem. Co., 08-0453, p. 14 (La.12/2/08), 999 So.2d 1104, 1114, quoting Reed, supra at pp. 13-14, 857 So.2d at 1021.
Moreover, the statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and was acting in good-faith reliance on that defense. Rudloff v. Louisiana Health Serv. & Indem. Co., 385 So.2d 767 (La.1979). This is especially true where a reasonable and legitimate question exists as to the extent and causation of a claim; bad faith should not be inferred from an insurer’s failure to pay within the statutory time limits when such reasonable doubts exist. Fontana v. Louisiana Sheriffs’ Automobile Risk Program, 96-2752 (La.App. 1 Cir. 6/20/97), 697 So.2d 1037, 1040; Patin v. Imperial Lloyds Ins. Co., *22 95-841, p. 11 (La.App. 3 Cir. 1/17/96), 670 So.2d 238, 244.
| ijiWe recognize that the determination of whether an insurer acted in bad faith turns on the facts and circumstances of each case, because a prerequisite to any recovery under the statute is a finding that the insurer not only acted (or failed to act), but did so arbitrarily, capriciously, and without probable cause. As this determination is largely factual, great deference is accorded the trier-of-fact. Smith v. Audubon Ins. Co., 95-2057, p. 9 (La.9/5/96), 679 So.2d 372, 377.
The question then is what constitutes a “satisfactory proof of loss from the claimant.” Courts have defined it as follows: “Satisfactory proof of loss ... is that which is sufficient to fully apprise the insurer of the insured’s claim. [Emphasis supplied.]” Maurice v. Prudential Ins. Co., 02-0993, p. 9 (La.App. 4 Cir. 10/23/02), 831 So.2d 381, 388; Cherry v. Audubon Ins. Co., 09-1646, p. 16 (La.App. 4 Cir. 10/20/10), 51 So.3d 109, 119.
Pacific contends that the earliest it was able to pay the claim was 17 April 2006. The primary delay was the late calculation of the coinsurance penalty that was contingent upon ACV determinations by Pacific. While the parties agree that the coinsurance penalty is 90%, Karkos admitted at trial that these calculations are usually done at the start of the adjusting period, rather than at the end. This delay cannot be attributed to the plaintiffs.
Coinsurance is defined by Couch on Insurance § 1.3 as:
Coinsurance: clause in property insurance requiring that the property be insured for a minimum percentage of its total value and making the insured a “coinsurer” to the extent that the coverage falls below the specified minimum.
The coinsurance percentage is found is found on the Supplemental Declarations Page of the Pacific policy. The Supplemental Declarations Page | ¡-.provides for a coinsurance percentage of 90% for damage to the building and business personal property and 100% for BI and extra expense.
The Pacific policy in question was drafted by Insurance Services Office, Inc., (“ISO”), and is a standard form commercial property insurance policy. The ISO policy contains a coinsurance provision that applies in accordance with the applicable coinsurance percentage shown in the declarations page. The operation of this provision effectively requires the insured to purchase a limit of insurance equal to the specified percentage of its full value. If, at the time of the loss, the limit of insurance specified in the declarations page is less than the amount required under the coinsurance provision, the loss recovery will be limited to a coinsurance percentage of the loss that is determined by using a ratio equal to the insurance amount carried to the insurance amount required. However, if the application of the coinsurance formula results in a figure that exceeds the applicable limit of insurance for the loss, the limit of insurance is the maximum amount that will be paid.[11]
The late calculation of the coinsurance provision was hampered by a change of the building value to loss ratio. The plaintiffs’ policy renewed one week before Hurricane Katrina, in which the building values were increased. Apparently, the new policy had not been written and/or transmitted to Pacific at the time the claim was filed; Kar-kos had only the prior year’s values from which to work while adjusting the claim. We agree that this was an error on Pacif *23 ic’s part. Pacific is presumed to know the contents of its own policy; we find this reason is insufficient to avoid penalties.
114Further, as we stated in Daney v. Haynes, 630 So.2d 949, 954 (La.App. 4th Cir.1993),
[T]he jurisprudence in this state indicates that a dispute over the amount owed because of the existence of coinsurance is not a valid defense for an insurer’s failure to pay a claim within the time period provided by statute. See Smith v. Louisiana Farm Bureau Casualty Insurance Co., 603 So.2d 199, 206 (La.App. 3d Cir.), writ denied 605 So.2d 1115 (La.1992); Youngblood v. Allstate Fire Insurance Co., 349 So.2d 462, 465 (La.App. 3d Cir.1977).
The case law reveals that where a reasonable disagreement between the insured and the insurer as to the amount of a loss exists, the insurer’s refusal to pay is not arbitrary, capricious, or without probable cause, and failure to pay within the statutory delay does not subject the insurer to penalties. Sibley v. Insured Lloyds, 442 So.2d 627, 632 (La.App. 1st Cir.1983). However, as recognized by this court in Warner v. Liberty Mut. Fire Ins. Co., 543 So.2d 511 (La.App. 4th Cir.1989):
However, if part of a claim for property damage is not disputed, the failure of the insurer to pay the undisputed portion of the claim within the statutory delay will subject the insurer to penalties on the entire claim. Sibley v. Insured Lloyds, 442 So.2d at 632; Leblanc [LeBlanc] v. Underwriters at Lloyd’s, London, 402 So.2d 292, 300 (La.App. 3d Cir.1981); O’Brian v. Allstate Ins. Co., 420 So.2d 1222, 1225 (La.App. 3d Cir.1982); Balehi Marine, Inc. v. Firemen’s Ins. Co., 489 So.2d 1360, 1363 (La.App. 1st Cir.1986); Deville v. Louisiana Farm Bur. Mut. Ins. Co., 378 So.2d 457 (La.App. 3d Cir.1979); rehearing den.
Consequently, when such a dispute arises, to avoid the imposition of penalties the insurer must unconditionally tender to the insured the undisputed portion of the insured’s claim. Sibley v. Insured, Lloyds, 442 So.2d at 632; Fuselier v. La. Farm Bur. Mut. Ins., 458 So.2d 657, 659 (La.App. 3d Cir.1984). [Emphasis supplied.]
On the other hand, we cannot agree with the plaintiffs on the date that a satisfactory proof of loss was received by Pacific. Although MKA submitted its | ^reports to Pacific in December 2005, it is unreasonable to think that Pacific could be fully apprised of the plaintiffs’ claims in light of the enormity and scope of the damage. Of course, Pacific would want to be sure that it wasn’t paying for any flood damage, which was substantial. The flood insurer’s estimates are dated 31 January 2006; we find Pacific well within its rights to review and compare its preliminary estimates against those of the flood insurer based upon the facts of this case.
We find that the 30-day period began to run no later than 1 March 2006, the date that Pacific received the Large Loss Notice. Pacific had, or should have had, all the information it needed to determine the plaintiffs’ loss at that time. In any event, as determined by the trial court, the final payments of $190,348 for the Mardi Gras and $415,974 for the Big Easy made by Pacific on 9-10 May 2006 were untimely.
We find, however, that the trial court erred by applying the penalties found in La. R.S. 22:1220 (up to two times the damages sustained) to damages falling under La. R.S. 22:658(25%). As such, we reverse that part of the judgment and will recalculate the appropriate penalty.
Pursuant to La. R.S. 22:658, we apply a 25% penalty to these late payments ($606,-322); the total amount of the penalty is *24 $151,580.50. For the purpose of penalties, we have excluded the advances totaling $250,000, as they were timely made.
We now turn to the late payment of the BI loss.[12] As the Louisiana Supreme Court has noted, interpretation of an insurance policy usually involves a legal ^question. Sher v. Lafayette Ins. Co., 07-2441, 07-2443, p. 5 (La.4/8/08), 988 So.2d 186, 192. The Court went on to state:
An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code. The judicial responsibility in interpreting insurance contracts is to determine the parties’ common intent. Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.
An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Unless a policy conflicts with statutory provisions or public policy, it may limit an insurer’s liability and impose and enforce reasonable conditions upon the policy obligations the insurer contractually assumes.
Id., p. 5, 988 So.2d at 192-93 (quoting Huggins v. Gerry Lane Enterprises, Inc., 06-2816 (La.5/22/07), 957 So.2d 127, 128-29).
The Pacific policy, in Endorsement CP 00 30 10 00, entitled “BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM, states:
A. Coverage
[[Image here]]
2. Business Income
Business Income means the:
a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
|17b. Continuing normal operating expenses incurred, including payroll.
This endorsement further provides:
E. Additional Condition Coinsurance If a Coinsurance percentage is shown in the Declarations, the following condition applies in addition to the Common Policy Conditions and the Commercial Policy Conditions.
We will not pay the full amount of any Business Income loss if the Limit for business income is less than:
a. The Coinsurance percentage shown for Business Income in the Declarations; times
b. The sum of:
(1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
(2) Operating expenses, including payroll expenses,'
*25 that would have been earned or incurred (had no loss occurred) by your “operations” at the described premises for the 12 months following the inception or previous anniversary date of this policy (whichever is later).
Instead, we will determine the most we will pay using the following steps:
1. Multiply the Net Income and operating expense for the 12 months following the inception, or the last previous anniversary date, of this policy by the Coinsurance percentage;
2. Divide the Limit of Insurance for the described premises by the figure determined in Step 1.; and
3. Multiply the total amount of the loss by the figure determined in Step 2.
We will pay the amount determined in Step 3, or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.
|isln determining operating expenses for the purpose of applying the Coinsurance condition, the following expenses, if applicable, shall be deducted from the total of all operating expenses:
[[Image here]]
11. All ordinary payroll expenses or the amount of payroll expense excluded (if Form CP 15 11 is attached);
The policy provides for 100% coinsurance for both BI and extra expenses and does not include Form CP 15 11; thus ordinary payroll expenses are not excluded from the determination of “operating expenses” for coinsurance purposes.
The general purpose of BI insurance is to protect the earnings which the insured would have enjoyed had no interruption or suspension occurred. Yount v. Lafayette Ins. Co., 08-0380, p. 14 (La.App. 4 Cir. 1/28/09), 4 So.3d 162, 171. Moreover, as a general rule, damages for loss of profits may not be based on speculation and conjecture; however, such damages need be proven only within reasonable certainty. Cox Communications v. Tommy Bowman Roofing, LLC, 04-1666, p. 8 (La.App. 4 Cir. 3/15/06), 929 So.2d 161, 166-67, citing Lavigne v. J. Hofert Co., 431 So.2d 74, 77 (La.App. 1st Cir.1983). Broad latitude is given in proving lost profits because this element of damages is often difficult to prove and mathematical certainty or precision is not required. Id., citing Louisiana Farms v. Louisiana Dept. of Wildlife and Fisheries, 95-845, p. 36 (La.App. 3 Cir. 10/9/96), 685 So.2d 1086, 1105.
When substantial, reasonable, and legitimate questions exist as to the extent of an insurer’s liability or an insured’s loss, the insurer’s failure to pay within the statutory time period is not arbitrary, capricious, or without probable cause. Louisiana Bag Co., Inc., supra, 08-0453, pp. 14-15, 999 So.2d at 1114. Because of the extensive flood damage to the buildings in question, Pacific had to confirm that it was paying for lost BI caused solely by wind.
113The plaintiffs used Mack as their expert and Pacific used Adrian of MDD as its expert in order to calculate the plaintiffs’ BI claim. Both experts testified at the trial.
Mack testified that, in his opinion, after applying the coinsurance percentage, the BI loss for the Mardi Gras was $497,873, and the BI loss for the Big Easy was $525,592. The calculation was for a total of eight months, as instructed by Pacific.
Mack testified that for the seven months before the storm, the average monthly net profit for the Big Easy was $48,243 and $74,125 for the Mardi Gras. He then looked at the reports of another casino owned by the plaintiffs, Stan’s Truck Stop (“Stan’s”) in New Orleans East, before and *26 after the hurricane; Stan’s had an increase of over 350% in profit and income following the storm. Mack increased the average monthly net profit by 200% to $100,000 for the Big Easy and $150,000 for the Mardi Gras, asserting that he was being prudent and recognizing the difference in the devastation in the relative locations. He then applied the coinsurance provision to arrive at his total for each facility.
In calculating the coinsurance penalty, Mack used the net income from the 31 July 2005 statements plus all expected continuing expenses. From that calculation, he arrived at a total insurance needed for seven months of $847,000 for the Mardi Gras and $715,000 for the Big Easy. In his opinion, the Mardi Gras should have been insured for $1.5 million per year and the Big Easy should have been insured for $1.2 million per year. The total insurance needed was divided by the total insured value, resulting in a coinsurance percentage for the Mardi Gras of 52.75%. Because the Mardi Gras was underinsured by 47.25%, he reduced the amount of the total loss by that percentage; conversely, the plaintiffs could only |2nrecover 52.75% of the actual loss sustained. For the Big Easy, the total coinsurance percentage was 70.48%; thus he reduced the total loss by 29.5%.[13]
The primary issue under cross-examination was Mack’s determination of “operating expenses” for the purpose of applying the coinsurance provision.
Q. Okay. Fine. So they specifically list those, right? Now, the policy unequivocally, unless you can see something in there I can’t, that all ordinary payroll expenses or the amount of payroll expenses excluded if the form is attached: So if the form isn’t attached under the terms of the policy, you would agree you include ordinary payroll in the calculation of the coinsurance of the insurance requirement.
A. Never had to before in any other case I’ve worked on.
Q. Now, as I understand it, in this you read your own conditions into this policy that don’t even exist in there, don’t you?
A. It’s illogical not to.
[[Image here]]
Q. Does it say payroll should not be included in the insurance requirement anywhere on the four corners of this policy?
A. No.
Q. Okay. Now, advertising. How much for advertising for a seven-month period on the Cinque income statement? A. 103,000.
Q. Now, how much of that did you use in your insurance requirement calculation?
A. I used 50 percent.
Q. Where in the four corners of this policy does it say reduce advertising by 50 percent when doing your insurance *27 requirement analysis to see if there’s any 12i coinsurance penalty? Where does it say that? Anywhere?
A. No
Q. You once again decided to write that in there, didn’t you?
A. (Witness nods.)
Q. Sir?
A. Yes, ‘cause illogical not to.[14]
Q. It’s not there, is it? Okay. In any event, you determined your insurance requirement by applying what you thought should be included as opposed to what the policy states, correct?
A. Correct.
Q. And you added that expense to the net income to come up with your insurance requirement of 1.4 million dollars, right?
A. Correct.
Q. Now, Mr. Adrian applied the policy as written in determining his insurance requirement, didn’t he?
A. Right to the letter of the law.
Q. All right. So you have no doubt that if you applied the policy as Mr. Adrian did it, you’d come up with the same numbers as he, wouldn’t you?
A. Sure, because we came up with the same numbers in the BI loss.
Q. So using Mr. Adrian’s requirement when applying the policy as written, the percent of BI that Mardi Gras recovers is only 24 percent of their total loss, correct?
A. Correct.
Q. And using Mr. Adrian’s calculations, using the policy as written results in the Big Easy collecting on 27 percent of the BI loss, correct?
A. Correct.
Q. Using your calculations allows Mardi Gras to collect a 52 percent of its ■loss and the Big Easy about 70 percent?
A. Correct. [Emphasis supplied.]
[¡^.Pacific relied on the testimony of Adrian, who, as admitted by Mack, followed the policy when making his calculations. Adrian testified that his purpose in making an analysis of coinsurance compliance was to determine if the BI loss was insured to value. That means that the policyholder needed to have enough insurance to satisfy the value, which would be the net income plus operating expenses, including payroll, which would have been earned during the 12 months following the policy inception. He further testified:
Q. Okay. Can you explain to the Court how this provision tells you you need to look at the insurance values and compare them to the — to find out whether the insured is insured to value?
[[Image here]]
A. If there is a coinsurance percentage shown in' the declarations page that means that the coinsurance provision applied. And what you do is you take the coinsurance percentage from the dec page and multiply it by the net income plus operating expenses, including payroll, which would have been earned or incurred during the 12 months following inception.
As calculated by Adrian, the insured-to-value number for the Mardi Gras was $3,182,380; in other words, the Mardi Gras should have carried that amount of insurance to properly insure itself for the BI *28 loss. With the 100% coinsurance provision applied, the actual insurance value for the business income limit purchased by the Mardi Gras was $766,000. The insurance carried was then divided by the insurance requirement, which resulted in a 24.75% collectible ratio loss. With regard to the Big Easy, the insured-to-value number was $3,178,409. Again, "with the 100% coinsurance provision applied, the actual insurance value for the business income limit purchased by the Big Easy was $866,000, which resulted |¾⅝⅛ a collectible loss ratio of 27.25%.[15] In other words, the plaintiffs had a collectible loss of $310,643 for the Mardi Gras and $187,674 for the Big Easy for a total of $498,317.
Adrian testified that he did not agree with Mack’s application of the coinsurance provision. By excluding all or most of the operating expenses, primarily payroll, the insured-to-value number would be much lower, resulting in higher collectible loss ratio.
After reviewing the policy and the testimony of Mack and Adrian, we find the trial court erred and was manifestly erroneous by relying on Mack’s testimony. He conceded that the more money the plaintiffs collect in BI, the more money he stands to earn as his fee. Such an arrangement is clearly improper and against public policy for public adjusters. See La. R.S. 22:1703, supra, at n. 13; Op. Atty. Gen., No. 06-0282 (March 23, 2007), 2007 WL 1100708. Clearly, this bias must, be taken into account when determining the weight given to Mack’s testimony. More importantly, however, Mack admitted under oath that he did not follow' the instructions of the policy while Adrian did; in other words, he testified that he ignored the clear and unambiguous language of the insurance policy, while he admitted that Adrian followed the policy’s mandates. As such, his testimony should not have been considered.
It is undisputed that the plaintiffs were paid a total of $498,317 for the loss of BI for both locations under the policy for a total of eight months. Returning to the timeline, we agree that the initial payment of $200,000 was untimely. On 13 | ^April 2006, Adrian submitted a report showing the loss of BI for five months at $219,866; four days later, Steen instructed Adrian to increase the indemnity period an additional three months. Therefore, $200,000 of the BI claim was undisputed and should have been paid within 30 days; instead, it was paid on 28 July 2006 and was untimely. It is uncontested by the plaintiffs that the payment by Pacific of $298,317 on 9 January 2007 was timely. Thus, penalties must be calculated under La. R.S. 22:658 on the sum of $200,000, as it was due under the policy; this amount is not consequential damage as envisioned by La. R.S. 22:1220. We find that the penalties due total to $50,000.
We now turn to the consequential damages, if any, incurred by the plaintiffs if the May 2006 payments for their wind-damage claims had been timely. In other words, the plaintiffs contend that the businesses could have been fully renovated and running by the end of April 2006, the end of the agreed eight-month period of restoration. The trial court found that because of Pacific’s delays, the Mardi Gras did not become fully operational until September 2006 (four months later) and the Big Easy *29 did not fully reopen until December 2006 (seven months later). Thus the trial court awarded a total of $1,300,000 for loss of business income, plus penalties of 1.5 times the award. Based on the evidence in the record, however, we do not find that the delays were entirely Pacific’s fault.
As Karkos testified, on 4 July 2006, he received an email from Steen, which stated in pertinent part:
I received a telephone call today from the public adjuster, Bruce Frazier and their accountant who is addressing the Business Income claim for Maloney Cin-que [Mardi Gras]. Initially, we had agreed to give them a 5 month [ 2r,period of indemnity for the Business Income claim. Both Frazier and the accountant advise me that they are requesting a total of 9 months for Business Income claims. They are claiming that the telephone systems just became available in the area and that the power just recently came on in that area. The insured is taking the position that they could not have done any of the repairs in a shorter period of time because of a lack of construction resources in New Orleans. Two of the facilities have just reopened within the last week and so their request now is for an additional four months Business Income....
I did confirm independently of my telephone conversation with them that the telephone systems were first online last week in that area of town and the electricity came on three weeks ago. [Emphasis supplied.]
No evidence exists in the record on appeal that the Mardi Gras could have reopened at the end of April 2006, since electricity was not available'at this location until early June 2006, that being the earliest date for reopening. As for the Big Easy, one of Steen’s reports to Karkos, dated 31 October 2006, states that the plaintiffs have “repeatedly requested at least 12 months for the period of indemnity due to the prevailing conditions in New Orleans, LA. The insured finally got electrical power to the ‘Big Easy Truck Stop’ five weeks ago,” which would have been at the end of September 2006.[16] [Emphasis added.] None of the parties are to blame for the “prevailing conditions” found in the city.[17]
Another delay was caused by the fact that the plaintiffs were severely underin-sured for the loss of BI. John Callegari, Chief Financial Officer for the plaintiffs, testified:
*30 Q. At some point when you joined Cin-que and Sept you came to the realization that you weren’t going to collect enough business-interruption insurance money because of the coinsurance that was applied, correct?
A. Yes, sir.
Q. In fact, you met with the family to discuss concerns about the low amount of BI money that you were going to receive under the terms of the policy and the coinsurance, correct?
A. Yes, sir.
Q. You believe, Mr. Callegari, that if you had sufficient business-interruption coverage, it would have enabled you to be up and running at the Big Easy and Mardi Gras, and Big Easy and Mardi Gras could have generated a significant amount of cash flow earlier on; correct?
A. I’m positive about that, yes. [Emphasis supplied.]
Further delays were caused by the plaintiffs’ banks. Callegari testified that many of the checks named both the plaintiffs and their bank that held the mortgage as payees. The bank, as lender, required the plaintiffs to demonstrate that they had completed and paid for repairs prior to releasing the funds from their accounts to cover those repairs. In other words, the plaintiffs had to find the money to pay for the repairs before they were reimbursed with the money paid by Pacific. Callegari conceded that these delays were not attributable to Pacific.
127Pacific argues that an additional delay was caused by the plaintiffs using their flood proceeds for purposes other than repairing the substantial flood damage caused to the buildings. The plaintiffs contend that the issue is the amount of money coming in late 2005 and January 2006, not in late April 2006.
It is undisputed that the video poker machines at the properties in question were owned by a related company, Lets Go, and were not insured at the time of Hurricane Katrina. Callegari testified that some of the insurance proceeds, flood or wind, were used to replace the video poker machines, although most of that money was obtained from various investment accounts of plaintiffs.
Considering the flood insurance payments, the record reflects that the Big Easy collected $200,000 on 24 November 2005 and $300,000 on 1 March 2006, for building damage caused by the flooding. It also received an advance of $50,000 from Pacific on 28 October 2005 for wind damage to the building, with an additional advance of $75,000 in late February 2006. However, only $22,000 was spent on repairs in 2005. By the end of 2006, a total of $669,425.27 had been spent on repairs for both flood and wind damage.
As for the Mardi Gras, on 20 January 2006, it received two checks for flood damage: the first one in the amount of $250,000 for contents; and the second in the amount of $359,179.17 for building damage. Like the Big Easy, the Mardi Gras also received the $50,000 and the $75,000 advances from Pacific. However, $21,408.96 was spent on repairs in 2005, with a 2006 total of $644,290 spent on both wind and flood damage.
 Plaintiffs have a duty to mitigate their damages. See La. C.C. art. 2002.[18] | ajThe jurisprudence holds that an *31 injured party’s duty to mitigate his damages requires him to take reasonable steps to minimize the consequences of the injury. Moody v. Cummings, 09-1238, p. 13 (La.App. 4 Cir. 4/14/10), 37 So.3d 1054, 1063, unit denied, 10-1106 (La.9/3/10), 44 So.3d 686. This concept also applies to minimizing the loss of business profits in the event of an interruption of the business. See Carpenter v. Hartford Acc. & Indem. Co., 333 So.2d 296, 301 (La.App. 1st Cir.1976).
If the flood money was being used to repair the buildings as it was being collected, whether for flood and/or wind damages (Callegari admitted that the money received from both insurers was not segregated), it is more likely than not that the loss of BI could have been minimized. However, the record reflects that because of the location of these two businesses, the Mardi Gras could not have reopened any earlier than the end of June 2006, and the Big Easy any earlier than the end of September 2006, due to the massive infrastructure damage sustained in that part of the city. Although we find that the May 2006 payments for wind damage were untimely, the record does not support a finding that timely payment would have changed the reopening dates of the Mardi Gras and the Big Easy, in light of the additional delays that were beyond Pacific’s control. However, while we agree with an award for consequential damages of three months for both the Mardi Gras and the Big Easy, we apply the coinsurance provision in the policy (see discussion below) and assess La. R.S. 22:1220 penalties on those totals.
12;)Plaintiffs successfully argued to the trial court in the hearing on their motion for new trial, that the coinsurance provision should not be applied on the loss of BI when determining the amount of their sustained loss for purposes of the penalty provision in La. R.S. 22:1220. We disagree. The BI loss sustained by the plaintiffs is the loss under the policy. The plaintiffs are not entitled to claim losses for more than the policy allows; otherwise, Pacific would be paying for the plaintiffs’ decision to underinsure their BI in the event of an interruption of business. This is significant; it is not alleged that the late payment of the amount of the BI loss prevented the plaintiffs from reopening their businesses earlier, nor do we find that the properties would have reopened earlier had the May 2006 building damage payments been made earlier.
In calculating consequential damages pursuant to La. R.S 22:1220, we use the figures most favorable to the plaintiffs. For the Big Easy, Mack determined that the business was losing $100,000 per month while Adrian calculated the amount as $87,174.88 per month. Conversely, Mack testified that the Mardi Gras was losing $150,000 per month, while Adrian arrived at a loss of $160,747.25 per month. We will use the higher numbers, multiply each by three, apply the coinsurance percentage, and then assess La. R.S 22:1220 penalties at 1.5 times the award, the multiplier used by the trial court. We find that the court was within its discretion in using this multiplier.
Pursuant to this process, we find that the Mardi Gras, after the application of coinsurance, sustained a BI loss of $119,354.83. It is also entitled to penalties in the amount of $179,032.25. With regard to the Big Easy, we find that it sustained |sna BI loss $81,750, after the application of coinsurance. We also award penalties in the amount of $122,625.[19]
*32 The next assignment of error relates to the $290,903 for extra expense damages. The policy provides as follows:
Additional Coverages
a. Extra Expense
Extra Expense means necessary expenses you incur during the “period of restoration” that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.
(1) We will pay any Extra Expense to avoid or minimize the “suspension” of business and continue “operations [.] ”
[[Image here]]
(2) We will pay any Extra Expense to minimize the “suspension” of business if you cannot continue “operations.”
[[Image here]]
to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.
Pacific contends that the amount of extra expenses awarded by the trial court were already paid as an additional two months of BI loss and that the award should be set aside. We disagree. We find that the trial court was correct when it rejected this argument. However, conflicting testimony exists regarding the amount of those expenses.
The plaintiffs claim that Steen authored a letter wherein he agreed to pay $290,903 in extra expenses. What we find in the record is that Steen agreed on that amount of extra expenses actually incurred, but advised the plaintiffs that |aTAdrian would determine the extent to which the extra expenses reduced the plaintiffs’ BI loss by helping the businesses to open sooner. Adrian determined that by spending $290,903 in extra expenses, the plaintiffs were only able to reduce their BI loss by $186,712. However, we do not find that the trial court abused its discretion by awarding $290,903; this assignment of error has no merit.
We now address Pacific’s remaining assignments of error. The first addresses the two awards (penalties and extra expenses) on which the trial court awarded “judicial interest from date of judicial demand.”[20] This issue was addressed by the Supreme Court in Sher, supra, at p. 21, 988 So.2d at 203:
Interest on penalties cannot be figured until penalties are imposed. Like penalties imposed under the worker’s compensation statutes, the penalties imposed on insurers become due only after the date of their award, and interest on such penalties is due only from the date of judgment.
Therefore, we amend the judgment to provide for interest at the legal rate from the date of judgment on those awards.
The remaining issue arose after the parties submitted their briefs. This addresses the fact that the trial court awarded La. R.S. 22:1220 penalties on the award for extra expenses, which are covered by the *33 insurance policy. In Durio v. Horace Mann Insurance Co., 11-0084, p. 18 (La.10/25/11), 74 So.3d 1159, 1170, the Court stated:
Further, as this Court recently noted, La. R.S. 22:1220 specifically refers to a breach of the duty of good faith and fair dealing, not a breach of the insurance contract. Wegener [v. Lafayette Ins. Co., 2010-0810 (La.3/15/11) 3260 So.3d 1220,] 60 So.3d at 1230. The duties of an insurer under La. R.S. 22:1220 are separate and distinct from its duties under the insurance contract. Id. at 1229. Thus, a claim against an insurer for breach of the insurance contract and a claim against an insurer for breach of its duty of good faith and fair dealing under La. R.S. 22:1220 are two separate causes of action. Because it is a violation of the statute, not a breach of the insurance contract, which triggers the penalty provision, it would be inconsistent to hold that contractual amounts due pursuant to the terms of the contract should be included as “damages sustained” under La. R.S. 22:1220.
Therefore, we reverse and set aside that portion of the judgment that awarded penalties under La. R.S. 22:1220; we award La. R.S. 22:658 penalties 25% to the award of $290,903 in the amount of $72,725.75.
Based upon the foregoing, we recast and restate the entire judgment rendered by the trial court to read as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that judgment is rendered in favor of Pacific Insurance Company, Ltd. and against Maloney Cinque, L.L.C. and Maloney Sept, L.L.C. dismissing Plaintiffs’ claims for additional damages for business income loss.
IT IS ORDERED, ADJUDGED, AND DECREED that judgment is rendered in favor of Maloney Cinque, L.L.C. and Maloney Sept, L.L.C. and against Pacific Insurance Company, Ltd. (a) in the amount of $290,903 for extra expense damages, (b) La. R.S. 22:658 penalties in the amount of $72,725.75, and (c) judicial interest from date of judgment on both sums.
IT IS ORDERED, ADJUDGED, AND DECREED that judgment is rendered in favor of Maloney Cinque, L.L.C. and Maloney Sept, L.L.C. and against Pacific Insurance Company, Ltd. for La. R.S. 22:658 penalties in the amount of $151,580.50 for late wind-damage payments, plus judicial interest thereon from date of judgment.
IT IS ORDERED, ADJUDGED, AND DECREED that judgment is rendered in favor of Maloney Cinque, L.L.C. and Maloney Sept, L.L.C. and |oSagainst Pacific Insurance Company, Ltd. for consequential damages (a) in the amount of $201,095.83, the amount that represents lost profits, (b) La. R.S. 22:1220 penalties in the amount of $301,643.75, and (c) judicial interest from date of judgment on both sums.
IT IS ORDERED, ADJUDGED, AND DECREED that La. R.S. 22:658 penalties be assessed in favor of Malo-ney Cinque, L.L.C. and Maloney Sept, L.L.C. and against Pacific Insurance Company, Ltd. in the amount of $50,000, for the late payment of $200,000 in Business Income, plus judicial interest thereon from date of judgment.
IT IS ORDERED, ADJUDGED, AND DECREED that judgment is rendered in favor of Pacific Insurance Company, Ltd. and against Maloney Cinque, L.L.C. and Maloney Sept, L.L.C. denying Plaintiffs’ claim for attorneys’ fees.
IT IS ORDERED, ADJUDGED, AND DECREED that judgment is rendered in favor of E.B. Ducasse Insurance Agency, Inc. and Utica Mutual Insurance Company and against Maloney *34 Cinque, L.L.C. and Maloney Sept, L.L.C., dismissing plaintiffs’ claims against these defendants, with prejudice.
Accordingly, we affirm the trial court judgment in part, reverse the trial court judgment in part, amend the trial court judgment in part, and render.

AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART; RENDERED.

.Pacific is a surplus line insurer and part of the Hartford Insurance Company. See La. R.S. 22:432 and 22:434:
[§ 432] If certain insurance coverages cannot be procured from authorized insurers, such coverages, hereinafter designated as "surplus lines”, may be procured from approved unauthorized insurers provided that the insurance is procured through a licensed surplus lines broker.
[§ 434] Insurance contracts procured as surplus lines coverage from approved unauthorized insurers in accordance with this Subpart shall be fully valid and enforceable as to all parties, and shall be given recognition in all matters and respects to the same effect as like contracts issued by authorized insurers.

. The plaintiffs were separately insured for flood damage through the National Flood Insurance Program.

. The plaintiffs also sued their insurance agent and his employer; the trial court found in favor of the agent and employer following trial, which ruling has not been appealed.

. The plaintiffs argued that the coinsurance provision should not be applied under La. R.S. 22:1220 (now La. R.S. 22:1973). See infra, n. 10. The court agreed and amended the judgment accordingly.

. Steen submitted 21 separate reports. Most, but not all, are summarized in the timeline below.

. First State provides management and adjusting services to Pacific. It is also part of Hartford Insurance Company. Karkos was responsible for handling plaintiffs’ claims.

. To avoid confusion, both First State and Pacific will be collectively referred to as "Pacific.” We note that some of the dates above may not be entirely accurate due to the extensive disorganization of the trial exhibits and missing documents, e.g., the various proofs of loss (that we would have liked to review). Suffice it to say that the above dates are close enough to the true dates to permit this court to analyze the issues presented in this case.

.Kenneth Mack is the plaintiffs' expert hired to evaluate the loss of BI claim.

. The record refers to proofs of loss for various claims under the policy but not for the wind-related damages.

. These statutes were renumbered in 2008. La. R.S. 22:658 has been amended and redes-ignated as La. R.S. 22:1892 and La. R.S. 22:1220 was redesignated as La. R.S. 22:1973. See Acts 2008 No. 415. Also, the substance of La. R.S. 22:658 was amended effective August 15, 2006, for claims arising on or after that date. See also Sher v. Lafayette Ins. Co., 07-2441, p. 14 (La.7/7/08), 988 So.2d 186, 199. The amendment increased the penalty and provided for attorney's fees. *21 See also Neal Auction Co., Inc. v. Lafayette Ins. Co., 08-0574, p. 14 (La.App. 4 Cir. 4/29/09), 13 So.3d 1135, 1144. These amendments do not apply retroactively. Sher, supra, at pp. 16-17, 988 So.2d at 200-01.

. See, e.g., www.schiffhardin.com/binary/johnson-property_damage.pdf

. Although Pacific did not specifically address the coinsurance issue in its brief, it is implicitly addressed; the Supreme Court in Merrill v. Greyhound Lines, Inc., 10-2827, p. 2 (La.4/29/11), 60 So.3d 600, 601, stated that an appellate court has the authority to consider an issue when there is no assignment of error. See also La. C.C.P. art. 2164; "The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal.” La. C.C.P. art. 2129 provides that an assignment of errors is not necessary in any appeal. Based on these codal authorities, we hold that an appellate court has the authority to consider an issue [on appeal and based upon the record] even when there is no assignment of error. Nicholas v. Allstate Ins. Co., 99-2522, pp. 7-8 (La.8/31/00), 765 So.2d 1017, 1022-23. Cf., Rule 2-12.4, Uniform Rules, Cts. of App.

. Under cross-examination, Mack admitted that his fee was contingent upon the plaintiffs’ recovery; the higher the plaintiffs' recovery, the higher his fee. The public adjuster, Alliance, also worked on a contingency basis. The arrangement was that Alliance would get 5% of the total and Mack would receive one-third of Alliance’s fee. La. R.S. 22:1703 provides in pertinent part:
A public adjuster may charge the insured a reasonable fee. A public adjuster shall not solicit for or enter into any contract or arrangement between an insured and a public adjuster which provides for payment of a fee to the public adjuster which is contingent upon, or calculated as a percentage of, the amount of any claim or claims paid to or on behalf of an insured by the insurer and any such contract shall be against public policy and is null and void.

. Similarly, Mack included only one-third of the utilities, $6,000 of the yearly amount of $35,000 for telephone service, and 50% of the bank charges.

. It is undisputed that the plaintiffs were paid a total of $498,317 for the total loss of BI. It does not appear that the plaintiffs dispute that amount if the coinsurance percentage calculated by Adrian is applied. Their argument is that they sustained a total BI loss of $1,300,000 before the coinsurance percentage is applied, and it is on that number, they claim, that penalties should be calculated.

. In an email dated 8 June 2006, Steen confirmed a conversation with Bruce Frazier ("Frazier”) of Alliance, the plaintiffs’ independent adjuster, wherein Steen stated that he had not yet received the signed and notarized ACV Proof of Losses. Frazier advised that all repairs to the Mardi Gras would be completed within one week and all repairs to the Big Easy would be completed within the next three weeks. While these deadlines may have been met, the businesses could not fully reopen without electricity.

. While, arguably, the plaintiffs may be entitled to additional BI under the policy, they failed to file their own appeal or answer the appeal pursuant to La. C.C.P. art. 2133 A:
An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part[.] In such cases, he must file an answer to the appeal, stating the relief de-mandedf.] The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer.
Because the plaintiffs did not separately appeal or answer the appeal challenging that part of the judgment in favor of Pacific, we are unable to award any additional money for a BI loss.

. La. C.C. art. 2002 provides:
An obligee must make reasonable efforts to mitigate the damage caused by the obligor’s failure to perform. When an obligee fails to make these efforts, the obligor may demand that the damages be accordingly reduced.

. For the Mardi Gras, three months of lost profits = $482,241.75 x 24.75% = $119,354.83 x 1.5 = $179,032.25. For the Big Easy, three months of lost profits = *32 $300,000 x 27.25% = $81,750 x 1.5 = $122,625.

. The plaintiffs argue that the defendant cannot raise this issue because it did not object to the judgment rendered by the trial court. The plaintiffs rely on La. C.C.P. 2085, which addresses confession of, or acquiescence in, a judgment. Neither situation applies in this matter. When judicial interest begins to run on penalties has been specifically addressed by the Supreme Court in Sher, above. We find no requirement that a defendant waives its right to appeal a legal error in a judgment simply because it did not object to it in the court below.