| | | |
|---|---|---|
| HUNTSMAN INTERNATIONAL, L.L.C. AND RUBICON, L.L.C. | * | NO. 2022-CA-0777 |
| | * | |
| | | COURT OF APPEAL |
| VERSUS | * | |
| | | FOURTH CIRCUIT |
| PRAXAIR, INC. | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2014-09087, DIVISION "N-8"
Honorable Ethel Simms Julien, Judge
* * * * * *
**Judge Paula A. Brown**
* * * * * *
(Court composed of Judge Daniel L. Dysart, Judge Paula A. Brown, Judge Tiffany Gautier Chase, Judge Dale N. Atkins, Judge Karen K. Herman)

**DYSART, J., CONCURS IN PART AND DISSENTS IN PART**
**HERMAN, J., CONCURS IN PART AND DISSENTS IN PART FOR THE REASONS ASSIGNED BY JUDGE DYSART**

Robert L. Redfearn, Jr.
Bruce Shreves
SIMON, PERAGINE, SMITH & REDFEARN, L.L.P.
1100 Poydras Street
3000 Energy Centre
New Orleans, LA 70163-3000

James M. Williams
CHEHARDY SHERMAN WILLIAMS MURRAY RECILE STAKELUM & HAYES, LLP
One Galleria Boulevard, Suite 1100
Metairie, LA 70001

Marie R. Yeates
James D. Thompson, III
Christopher V. Popov
Michael A. Heidler
VINSON & ELKINS, LLP
845 Texas Avenue
Suite 4700
Houston, TX 77002

COUNSEL FOR PLAINTIFF/APPELLEE


Craig Isenberg
Chloe M. Chetta
Lance W. Waters
BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, LLC
909 Poydras Street, Suite 2350
New Orleans, LA 70112

Thomas More Flanagan
Anders F. Holmgren
Camille E. Gauthier
FLANAGAN PARTNERS, LLP
201 St. Charles Avenue
Suite 3300
New Orleans, LA 70170


COUNSEL FOR DEFENDANT/APPELLANT

**AFFIRMED**
**APRIL 19, 2024**

PAB
TGC
DNA

The instant litigation arises from a breach of contract claim, relating to four industrial gas supply contracts between the parties. Appellant, Praxair, Inc., now known as Linde, Inc. ("Praxair"), appeals the district court's July 12, 2022 judgment in favor of Huntsman International, L.L.C. ("Huntsman"), which was rendered based upon the April 29, 2022 jury verdict, following a three-week trial. The jury found that: Praxair had breached its gas supply contracts with Appellee, Huntsman; Praxair's breach caused damages to Huntsman; Huntsman suffered lost profits from lost sales stemming from that breach in the amount of $88,117,405; and Huntsman incurred expenses when it purchased back-up gas from a third-party supplier in the amount of $4,991,473. For the reasons that follow, we affirm the district court's July 12, 2022 judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

At the heart of this dispute are four industrial gas supply contracts that were executed between 1970 and 1998 by the parties or their predecessors in interest.[1] As to the parties involved in the case *sub judice*, Huntsman is a chemical

---

[1] In this appeal, the only pertinent parties are Huntsman and Praxair. A detailed explanation of Huntsman's and Praxair's predecessors in interest, who signed the four agreements at issue, is presented in this Court's earlier opinion in *Huntsman International LLC v. Praxair, Inc.*, 2015-0975, pp. 6-7 (La. App. 4 Cir. 9/14/16), 201 So.3d 899, 905-06.

1

manufacturer and Praxair is an industrial gas supplier. In the agreements, Huntsman agreed to buy from Praxair and Praxair agreed to sell to Huntsman certain designated amounts of carbon monoxide and hydrogen gas per day.[2] Huntsman uses these materials to produce methylene diphenyl diisocyanate ("MDI") and aniline at its facility located in Geismar, Louisiana. The Praxair plant in Geismar is immediately adjacent to the Huntsman plant and was connected by pipelines at all times material to this case.

Hydrogen is used in the production of aniline, while aniline and carbon monoxide are critical components used in the production of MDI. Huntsman refines MDI into various grades and sells it to third parties. In addition to using aniline to manufacture MDI, Huntsman also sold aniline separately to third parties. According to the record, Huntsman's MDI production is a much larger part of its business than its aniline production. MDI is used to produce a multitude of products, some of which include mattress foam, shoe soles, adhesives, insulating foam and certain car components.

Huntsman initiated the underlying litigation on September 16, 2014, asserting, *inter alia*, a breach of contract claim arising from Praxair's repeated disruptions in the supply of carbon monoxide and hydrogen, spanning the period from September 16, 2004 to December 31, 2013. These disruptions in supply caused damages in the form of lost profits from lost sales as well as damages that Huntsman sustained when it was forced to purchase gases from a third-party supplier in order to meet its obligations to its contract customers (Huntsman refers to these as "cover damages.").

---

[2] The daily amounts of these gases that Praxair agreed to have available for Huntsman's use were 10.5 million cubic feet of carbon monoxide and 43 million cubic feet of hydrogen.

The varying types of Huntsman's customers are integral to its calculation for lost profits. As explained by Huntsman, its customer base is roughly comprised of three differing categories: (1) contract customers—these are customers who have long-term agreements with Huntsman and represent approximately two-thirds of Huntsman's business; (2) semi-contract customers—Huntsman's witnesses described these as longstanding customers who routinely purchase from Huntsman on a fairly regular basis, but do not have a formal sales agreement; and (3) opportunistic sales customers—these are customers who purchase from Huntsman when it suits them, without any formal contractual agreement. Purchases made by customers in the second and third categories make up what Huntsman refers to as "spot" sales, which typically generate a higher profit margin (Huntsman refers to profit margins as "contribution margins"). Testimony from various Huntsman employees indicated that, in spite of the supply disruptions, it was able to fulfill all of its obligations to its contract customers; meaning, all of its alleged lost profits came from the missed opportunity to sell its products to spot sales customers at higher contribution margins.

After a three-week trial, the jury returned a verdict in favor of Huntsman, awarding them a total of $93,108,878, with $88,117,405 of the award derived from damages for lost profits from lost sales and the remaining $4,991,473 in cover damages. Based on the jury's verdict, the district court rendered judgment on July 12, 2022, for the total amount awarded by the jury, plus judicial interest from the date of judicial demand[3] until the date on which the judgment is satisfied. Shortly thereafter, on July 19, 2022, Praxair timely filed a motion for judgment

---

[3] Huntsman filed its petition for damages on September 16, 2014.

notwithstanding the verdict ("JNOV") or, in the alternative, for new trial. After a contradictory hearing on September 16, 2022, the district court denied the motion.

This timely appeal followed.

## DISCUSSION

Praxair asserts three assignments of error for this Court to consider, which we summarize as follows:

1. The district court erred in allowing Huntsman to repudiate its discovery responses and expert's calculations and seek lost profits in excess of the amounts it disclosed pretrial.

2. The district court erred in awarding any damages for lost sales, which were not supported by the record, and, in the alternative, lost profits in excess of the amount testified to by Huntsman's expert.

3. The district court erred in failing to grant a new trial on damages based upon the new evidence presented at the hearing.

Before turning to the merits of this appeal, we will first address jurisdiction and the standard of review, and set forth the law applicable to this appeal.

*Jurisdiction*

First, we recognize that "the denial of a motion for new trial is not a final, appealable judgment." *Breston v. DH Catering, LLC*, 23-0460, 0461, p. 14 (La. App. 4 Cir. 2/5/24), ___ So.3d ____, ____, 2024 WL 443376, at *6 (quoting *Succession of Hickman*, 22-0730, p. 6 (La. App. 4 Cir. 3/15/23), 359 So.3d 584, 590). "However, an appellate court may consider interlocutory judgments, such as the denial of a motion for new trial, as part of an unrestricted appeal from a final judgment." *Everett v. Air Prods. & Chems., Inc.*, 22-0539, 0540, 0541, p. 7 (La. App. 4 Cir. 5/2/23), ___ So.3d ____, ____, 2023 WL 3193154 at *3 (quoting *New Orleans Fire Fighters Pension & Relief Fund v. City of New Orleans*, 17-0320, p. 5 (La. App. 4 Cir. 3/21/18), 242 So.3d 682, 688 n.12). Accordingly, because

4

Praxair seeks to appeal the July 12, 2022 judgment, which is a final, appealable judgment, we will also review the district court's denial of Praxair's motion for new trial.

*Standard of review*

This Court's jurisprudence has held that a jury's award of lost profits is reviewed under the manifest error or clearly wrong standard of review. *Breton Sound Oyster Co., v. Stiel Ins. Co. of New Orleans Inc.*, 17-0955, p. 20 (La. App. 4 Cir. 12/12/18), 299 So.3d 80, 94 (citing *N-Y Assocs., Inc. v. Bd. of Comm'rs of Orleans Par. Levee Dist.*, 04-1598, 04-1986, p. 13 (La. App. 4 Cir. 2/22/06), 926 So.2d 20, 27). Furthermore, "[t]he district court has 'broad discretion in [ ] granting or denying a motion for new trial, and we review a denial under an abuse of discretion standard.'" *Moore v. Choice Found.*, 18-0603, p. 3 (La. App. 4 Cir. 5/29/19), 274 So.3d 33, 36 (second alteration in the original) (quoting *Bonnette v. Bonnette*, 15-0239, pp. 22-23 (La. App. 4 Cir. 2/17/16), 185 So.3d 321, 334). However, "where one or more [district] court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable." *Jones v. Maryland Casualty Co.*, 18-0552, 0553, 0554, 0555, pp. 5-6 (La. App. 4 Cir. 5/11/22), 339 So.3d 1243, 1247 (quoting *Provosty v. Arc Constr., LLC*, 15-1219, p. 13 (La. App. 4 Cir. 11/2/16), 204 So. 3d 623, 632.). "[I]f the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence." *Id*. at p. 6, 339 So.3d at 1247 (alteration in original). Praxair avers that the district court's award for lost profits, based on the jury's finding, is tainted by legal error and should be reviewed by this Court *de novo*. As will be discussed below in examining Praxair's assigned errors, a *de novo* review of the record on appeal is not appropriate: the district court did

5

not commit legal error. Consequently, we will review the instant appeal under a manifest error standard of review.

*Applicable law*

"The 'elements of a breach of contract claim are the existence of a contract, the party's breach thereof, and resulting damages.'" *Payphone Connection Plus, Inc. v. Wagners Chef, LLC*, 19-0181, p. 8 (La. App. 4 Cir. 7/31/19), 276 So.3d 589, 595 (quoting *1100 S. Jefferson Davis Parkway, LLC v. Williams*, 14-1326, p. 5 (La. App. 4 Cir. 5/20/15), 165 So.3d 1211, 1216.). "It is well-settled that '[t]he party claiming the rights under the contract bears the burden of proof.'" *Id.* at pp. 8-9, 276 So.3d at 595 (alteration in original). In its arguments to this Court, Praxair does not dispute that it had a contract with Huntsman or that Praxair was at fault for breaching that contract. Instead, Praxair argues that the jury erred in finding that Praxair's breaches caused Huntsman to lose sales or, alternatively, that the jury erred in the amount awarded to Huntsman for lost profits caused by Praxair's breaches.

"Compensatory damages are those awarded on the basis of the loss suffered and are designed to replace the loss caused by the wrong or injury." *FIE, LLC v. New Jax Condo Ass'n*, 16-0843, 17-0423, pp. 13-14 (La. App. 4 Cir. 2/21/18), 241 So.3d 372, 387 (footnote omitted) (citing *McGuire v. Kelly, unpub.*, 10-0562 (La. App. 1 Cir. 1/30/12), 2012 WL 602366, at *16). "Compensatory damages are further divided into the broad categories of special damages and general damages." *Id*. at p. 14, 241 So.3d at 387. "Special damages are those which have a 'ready market value,' such that the amount of the damages theoretically may be determined with relative certainty." *Id*. (citing *McGee v. A C & S. Inc.*, 05-1036, p. 3 (La. 7/10/06), 933 So.2d 770, 773). "Loss of business income or profits is a type

6

of special damages." *Cox, Cox, Filo, Camel & Wilson, LLC v. La. Workers' Comp. Corp.*, 21-00566, p. 8 (La. 3/25/22), 338 So.3d 1148, 1155 (citing *Nick Farone Music Ministry v. City of Bastrop*, 50,066, p. 4 (La. App. 2 Cir. 9/30/15), 179 So.3d 629, 631).

"As a general rule[,] 'damages for loss of profits may not be based on speculation and conjecture; however, such damages need be proven only within reasonable certainty.'" *PVCA, Inc. v. Pacific West TD Fund LP*, 20-0327, p. 14 (La. App. 4 Cir. 1/20/21), 313 So.3d 320, 331 (quoting *Breton Sound Oyster Co.*, 17-0955, p. 14, 299 So.3d at 90). "Broad latitude is given in proving lost profits because this element of damages is often difficult to prove and mathematical certainty or precision is not required." *Id.* "The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the evidence." *Cox, Cox, Filo, Camel & Wilson, LLC*, 21-00566, p. 11, 338 So.3d at 1157 (first citing *Breaux v. Woods*, 20-0161, p. 8 (La. App. 3 Cir. 11/18/20), 307 So.3d 396, 402; and then citing *Caruso v. Acad. Sports & Outdoors*, 18-0496, p. 7 (La. App. 5 Cir. 4/24/19), 271 So.3d 355, 362). "That is, the plaintiff must show that the loss of profits is more probable than not." *Breton Sound Oyster Co.*, 17-0955, p. 14, 299 So.3d at 90 (quoting *Wasco, Inc. v. Econ. Dev. Unit, Inc.*, 461 So.2d 1055, 1057 (La. App. 4th Cir. 1985)). Moreover, if the defendants do not refute the evidence offered by the plaintiffs to prove their special damages, and the record supports the plaintiffs' assertion, the district court does not err if it awards those damages. *See Cox Commc'ns v. Tommy Bowman Roofing, LLC,* 04-1666, p. 9 (La. App. 4 Cir. 3/15/06), 929 So.2d 161, 167.

With these precepts in mind, we now turn to Praxair's assignments of error. *Assignment of error No. 1—de novo vs. manifest error standard of review*

7

In its first assignment of error, Praxair contends that the district court's award for $88,117,405 in lost profits, based on the jury's finding, is tainted by legal error and should be reviewed by this Court *de novo*. Praxair argues that the district court allowed Huntsman to flout discovery rules by not disclosing the amount of special damages it would seek at trial and later permitted Huntsman to offer new damages calculation methodologies and theories in its closing argument to the jury.

Huntsman counters that it had always asserted damages in excess of $100 million dating back to its original petition filed in 2014. Praxair points out that the $100 million referenced in the petition included several other causes of action that were dismissed prior to trial and that the only remaining cause of action at the time of trial was Huntsman's claims for lost profits and cover damages. Huntsman insists that in its closing argument it used the methodology espoused by its economic damages expert, Rebecca Szelc ("Ms. Szelc"), but simply offered that the jury consider that the contribution margins she used in her calculations were too low. This assertion was based upon Ms. Szelc's trial testimony, wherein she stated that she based her contribution margin calculations on an average of all sales, including contract sales; however, all the testimony elicited at trial indicated that no contract sales were lost as a result of Praxair's breaches. After reviewing the record on appeal, we find Huntsman's arguments to be more persuasive.

In opening statements, counsel for Huntsman told the jury that they would hear testimony that Huntsman sustained approximately $42.5 million in damages for lost profits from lost sales due to Praxair breaches, plus cover damages for expenses incurred when it was forced to obtain backup gas supplies from Air Products, a third-party industrial gas supplier. However, counsel went on to posit

that the actual amount of damages to Huntsman was "quite a bit higher," and that its own damages expert, Ms. Szelc, took a "very conservative approach." While acknowledging that the total amount of damages the jury would hear from Ms. Szelc was $42.5 million, counsel stated, "I have other witnesses to talk about how much more was incurred in damages."

During questioning of its first witness, CEO Peter Huntsman ("Huntsman's CEO"), co-counsel for Huntsman, who did not give the opening statement, referred to damages as exceeding $100 million, at which time Praxair's counsel requested a sidebar. With the jury outside the courtroom, Praxair's counsel lodged an objection on the record, seeking to have the district court enjoin Huntsman from making any further reference to a potential $100 million damages claim. Counsel for Huntsman maintained that he could prove that the damages claim for lost profits and cover damages were valued at $100 million, and that there is no legal prohibition to asking a jury for an amount of damages as long as that amount could be proven. The district court addressed the issue by offering that:

> I'm not aware of any prohibition to a person or a party seeking whatever amount of damages. They have to prove it and that may go to any issues of credibility or so forth that you can raise. But I don't think you can tell a plaintiff they can't ask for the moon, even though they may not get it.

On the following day, Praxair submitted a written motion to exclude references to damages beyond the amount calculated by Huntsman's damages expert. From the bench, the district court ruled on Praxair's objection and written motion by finding:

> The Court's going to stand by its ruling. I believe that what happens if in fact the plaintiffs are unable to make their case as to the amount of damages, or if they offer any evidence that's unsubstantiated by the discovery and information they've already given to the defendant's

9

[sic] and the Court finds it to be ambush, then the Court will take action relative to that.

From this ruling, Praxair filed an emergency supervisory writ application with this Court. This Court denied the writ application without reasons. *Huntsman Int'l LLC, v. Praxair, Inc.*, 22-0257 (La. App. 4 Cir. 4/20/22). Likewise, the Louisiana Supreme Court denied Praxair's subsequent writ application to that Court without reasons. *Huntsman International LLC, et al. v. Praxair, Inc.*, 22-00666, p. 1 (La. 4/22/22), 336 So.3d 894, 895.

In closing arguments, Huntsman's counsel maintained that Ms. Szelc's calculations of lost profits were far too conservative and urged the jury to consider this in their deliberations. Because Huntsman did not lose any contract sales due to Praxair's shortages, Huntsman's counsel asked the jury to examine spreadsheets used by Ms. Szelc in her calculations, but to disregard the contribution margins calculated by her that also considered contract sales. Instead, Huntsman's counsel asked the jury to substitute much higher contribution margins that were more reflective of amounts lost in spot sales only.

Ms. Szelc's formula for calculating lost profits—lost pounds of production multiplied by contribution margins, which equaled the total amount of lost profits—applied contribution margins of 36 cents for MDI and 8 cents for aniline. Counsel for Huntsman suggested in closing that the jury should instead apply contribution margins of 82 cents for MDI and 25 cents for aniline, which he argued were contribution margins consistent with what spot sales—the top third of Huntsman's business—typically generate, and which would result in a lost profits

10

award of $88,117,405. Alternatively, counsel urged the jury to use even higher contribution margins consistent with what sales to Huntsman's top 100 customers typically generate and multiply that figure by the amount of lost production, which would result in an award for lost profits closer to $186 million. The jury found that Huntsman sustained damages for lost profits in the amount of $88,117,405.

Praxair contends that it was legal error for the district court to overrule its objection to Huntsman's counsel's references at trial to lost profits amounts greater than the calculations of Huntsman's damages expert, whose pre-discovery expert report provided the only calculations for this item of special damages to Praxair. Praxair is adamant that this ruling allowed Huntsman to present new damages models in closing argument and urge the jury to award much higher damages for lost profits than the amount supported by Huntsman's expert witness or any other witness who testified at trial. According to Praxair, Huntsman's actions constituted "trial by ambush," and the legal error alleged by Praxair tainted the district court's lost profits award when the only figure for Huntsman's lost profits revealed in pre-trial discovery was the approximately $37.5 million figure presented in Huntsman's damages expert's report. Praxair urges that because the district court legally erred, a *de novo* review of the jury award for lost profits is warranted. We disagree.

Based on our review of the record, we do not find that a different model was used for calculating damages; rather, Huntsman requested that the jury apply a different contribution margin in Ms. Szelc's formula. Further, we note that in its

reasons for overruling the objection, the district court made clear that Huntsman was still required to prove whatever amount of damages it sought. We find no legal error in the district court's ruling and conclude that *de novo* review is not warranted in this matter. Accordingly, the appropriate standard of review is manifest error.

*Assignment of error No.2—lost sales and lost profits*

In its second assigned error, Praxair proposes two alternative arguments. First, Praxair posits that under a *de novo* review, this Court should vacate the jury award for lost profits because the complete record does not contain evidence that proves that there were any lost sales leading to these damages. In the alternative, Praxair argues that even under a manifest error standard of review this Court is required to review the whole record to determine whether the district court's finding is clearly wrong, and at the very least, whether the award should be reduced because it exceeded the amount testified to by Ms. Szelc. In support, Praxair cites *Trant v. United Fire & Casualty Ins. Co.* for the proposition that "the appellate court must do more than simply review the record for some evidence that supports or controverts the [district] court's finding." 06-1494, p. 2 (La. App. 4 Cir. 3/28/07), 954 So.2d 797, 799 (quoting *Mart v. Hill*, 505 So.2d 1120, 1127 (La. 1987)). And further that "[t]he appellate court must review the record in its entirety to determine whether the [district] court's finding was clearly wrong or manifestly erroneous." *Id.* Arguing again that the record does not contain evidentiary support for an award of lost profits from lost sales, Praxair additionally

urges this Court to find that the damages awarded by the jury were so grossly excessive and arbitrary that it constitutes a violation of Praxair's due process rights. We will address each of these arguments in turn.

*Lost sales*

Praxair does not challenge the amount of lost pounds of production of MDI or aniline as presented by Ms. Szelc in her expert report[4]; rather, Praxair objects to her supposed methodology in calculating lost sales—that lost sales equaled lost production, based on the assumption that Huntsman's Geismar plant sold everything it made. Praxair posits that, in the absence of definite proof of lost sales, no lost sales can be attributed to their breach of the supply contracts; therefore, there can be no award for lost profits.

To rebut Praxair's arguments, Huntsman offers that the testimony at trial elicited from Ms. Szelc and various Huntsman employees and the voluminous contemporaneous internal documentation offered into evidence are sufficient to prove that it lost sales, particularly in times of high demand. We agree.

At trial, Ms. Szelc assured the jury that there were lost sales and described how she reached this conclusion. Ms. Szelc explained that she deduced from Huntsman's daily downtime reports that there were 268 days of actual lost production as a direct result of shortages of hydrogen and carbon monoxide. Testimony from other Huntsman employees described the Geismar facility as

---

[4] Ms. Szelc found that Huntsman missed out on spot sales for 97,675,260 pounds of lost MDI production and 32,104,609 pounds of lost aniline production.

having three different units that could produce MDI. Ms. Szelc testified that even on days when Praxair breached its gas supply obligations, if two of those three units were operational, she would remove that day from her calculations because she was uncertain of why the third unit was not running or whether the two functioning units could offset that lost production. As a result, she eliminated 25 days for that reason, and 42 days for when there were "demand or inventory" issues. This meant either demand was "arguably soft" or Huntsman had enough inventory of a particular product so it did not need to run the plant at full capacity. Subtracting those days, Ms. Szelc calculated that there were 201 days where Huntsman lost production solely due to Praxair's shortfalls and then calculated the number of pounds of lost MDI and aniline production for those days.[5]

Additionally, she reviewed emails from the time period at issue, including ones to Huntsman's sales team personnel from Steve Burns ("Mr. Burns"), who was responsible for all of Huntsman's sales in North and South America from 2011-2019. Some of these emails showed that there was a time period when Huntsman was forced to take steps to repress demand due to the diminished supply of gases from Praxair. Mr. Burns confirmed the contents of these emails when he testified at trial. In conclusion, Ms. Szelc opined that after considering Huntsman's historical sales records, sales and operating forecasts, downtime

---

[5] We also note that Ms. Szelc testified that during the time period at issue in this case, Huntsman sold 99% of what it produced in both MDI and aniline. Ms. Szelc relayed that Huntsman's records demonstrated that it sold virtually everything it produced. If total production figures exceeded total sales in a particular month, that could be explained by the fact that Huntsman continued to classify its products as inventory even while in transit to a committed buyer.

reports, correspondence and the rest of the record in this case, Huntsman lost sales as a result of Praxair's shortfalls in providing carbon monoxide and hydrogen.

One of Praxair's witnesses, Przemek Jamroz ("Mr. Jamroz"), was accepted by the district court as an expert in industrial gas operations and gas supply. At trial Mr. Jamroz theorized that availability is a better measurement of Praxair's performance than reliability. He believed that it was more accurate to determine whether Huntsman's production was impeded due to the unavailability of carbon monoxide and hydrogen, regardless of who supplied the gases, than to simply point to Praxair's breaches. Therefore, if the gases were available to Huntsman, any alleged lost sales because of lost production could not be associated with Praxair's failure to perform. Attributing the gases supplied to Huntsman by third parties to the benefit of Praxair, Mr. Jamroz calculated that during the period at issue, Praxair had a 97% availability rate for carbon monoxide and a 98% availability rate for hydrogen.

Praxair attempted to tender a witness, Dr. Klaus Weisenberger ("Dr. Weisenberger"), as an economic damages expert in order to challenge Ms. Szelc's damages model; however, finding that the witness had no relevant financial expertise, the district court rejected him as an economic damages expert witness, but allowed him to qualify as an expert in MDI protocols and models instead. He testified that Huntsman's records showed that it always had MDI inventory during the period at issue, which, in his opinion, meant that Huntsman would not have suffered any lost sales. In his reading of Huntsman's records, Dr. Weisenberger

15

concluded that anything listed as inventory was always available to be sold to other customers, even if it was en route to another buyer.

The jury also heard the testimony of Mark Dearman ("Mr. Dearman"), the general manager of Huntsman's Geismar manufacturing facility. In contrast to Mr. Weisenberger's opinion, Mr. Dearman clarified that some of the product listed as inventory was no longer available for sale, but Huntsman's books continued to classify it as inventory until the moment of delivery. As he described it:

> So, as it pertains to MDI, inventory is the total quantity of product we need to fulfill our sales and operations plan. There's a certain quantity of MDI we keep on site to produce all of these variations of the products for our customers. But all of the material, whether it's sitting in a warehouse or a distribution site or a rail transloading yard, until it actually is delivered to the customer, it's in inventory. But it's already committed product. It can't be reversed and uncommitted and then distributed to someone else.

Mr. Dearman, echoing Mr. Burns' trial testimony, relayed to the jury that sometime in 2012—during a period in which Praxair's supply shortage was particularly acute—in order to avoid shortfalls with its contract customers, Huntsman was forced to implement what they referred to as "extreme sales allocation." As he explained it, this was an element of sales control whereby Huntsman placed severe restrictions on sales to its noncontract, spot sales customers and, in some instances, referred those potential customers to its competitors in order to obtain the product they were seeking from Huntsman. Ms. Szelc's testimony described this time period in 2012 as being a predominantly "hot" market for MDI, where the global demand for MDI far outstripped the

16

available supply.[6] She further opined that because Huntsman was selling nearly all of the product it made throughout the relevant time period, the interruption of production due to Praxair's supply shortages had an even more pronounced impact on Huntsman's lost profits from potential sales at this time.

To bolster its position, Praxair relies upon *Platinum City, L.L.C. v. Boudreaux*, 11-559, p. 9 (La. App. 3 Cir. 11/23/11), 81 So.3d 780, 786 (wherein that court pronounced that "[a] court is not justified in fixing damages in the absence of definite proof." (quoting *Campbell v. Lelong Trust*, 327 So.2d 533, 536 (La. App. 2d Cir. 1976)). Furthermore, Praxair argues that Huntsman's self-serving assertions that it sold every pound of aniline or MDI it produced cannot support a special damages award and cites to *First Alarm Fire Equipment, Inc. v. Southland International of Louisiana, Inc.*, 47,823, pp. 7-8 (La. App. 2 Cir. 5/8/13), 114 So.3d 1168, 1172, wherein that court noted that "generally a claim for lost profits cannot rest solely on the testimony of the injured party without being substantiated by other evidence." (citing *Simpson v. Restructure Petroleum Mktg. Servs., Inc.*, 36,508, pp. 6-7 (La. App. 2 Cir. 10/23/02), 830 So.2d 480, 484)). We find Praxair's reliance on *Platinum City* and *First Alarm Fire Equip., Inc* to be misplaced.

In *Platinum City*, the plaintiff was the owner of a nightclub that was wrongfully evicted by the defendant prior to the expiration of a lease contract. The plaintiff made a claim for damages for lost profits for its business operations

---

[6] Ms. Szelc also identified 2006 and 2013 as being "hot" market years for MDI sales.

that would have been conducted in the remaining months of the lease; however, the plaintiff failed to offer any business records or any calculations of what its losses might be. As we have just discussed, that was certainly not the case in the matter now before us.

In *First Alarm Fire Equip.*, the plaintiff alleged a breach of contract for the purchase of certain commercial trucks from the defendant at a set price. The plaintiff asserted that prior to fulfilling its order under the purported contract, the defendant sold the remaining trucks in its inventory to a third party. The plaintiff filed suit claiming damages for the loss of the profits it would have earned had it been able to purchase and resell the trucks. The defendant filed a motion for summary judgment asserting that the plaintiff would be unable to carry its burden of proof at trial that it had suffered any damages. The district court granted summary judgment in the defendant's favor, noting that the plaintiff had failed to develop any mathematical evidence of lost profits in the 12 years since it filed suit and that the plaintiff would be "pulling things out of the air" in order to determine whether the plaintiff had sustained damages. The only evidence proffered by the plaintiff was an affidavit of the company's president that merely contained speculative figures as to the amount of lost profits it sustained. Again, the facts of that case are clearly distinguishable from the case under review.

We find more compelling the case that came before this Court in *Citadel Broadcasting Corp. v. AXIS U.S. Insurance Co.*, 14-0326 (La. App. 4 Cir. 2/11/15), 162 So.3d 470. The plaintiff in that case was a broadcasting company

that owned three radio stations located in New Orleans at the time that Hurricane Katrina struck. Because of damages sustained as a result of the storm, each of the radio stations were off the air for varying lengths of time. The plaintiff filed a claim with its insurer, the defendant, and sought reimbursement for lost profits due to business interruption. When the defendant refused payment on the claim, the plaintiff filed suit. The defendant asserted that the plaintiff failed to prove its lost profits because it had not produced evidence on a customer-by-customer basis as to why advertisers or listeners did not advertise or listen to one of the plaintiff's radio stations. We rejected that argument, finding it to be overly burdensome to produce evidence on a customer-by-customer basis, and noted instead that "[p]roof of such losses need only be as precise as circumstances in a particular situation allow." *Id.* at p. 4, 162 So.3d at 475 (citing *Maloney Cinque, L.L.C. v. Pac. Ins. Co.,* 11–0787, p. 18 (La. App. 4 Cir. 1/25/12), 89 So.3d 12, 25.).

Similarly, in the case *sub judice*, we find it wholly unreasonable and overly burdensome to expect that Huntsman would maintain some sort of list or log for sales not made. Ms. Szelc highlighted in her testimony that it was impossible for her to review documents to determine whether there were lost spot sales because, "[w]hen the sale doesn't come there is no sales document." Although Praxair produced an email addressed to Huntsman's purchasing director, Don Jennings ("Mr. Jennings"), in which a customer declined to purchase aniline from Huntsman, Ms. Szelc said the correspondence was anomalous "because not every customer is going to take the time to write an email to say I'm not buying from

you." Accordingly, we conclude that based upon the testimony and evidence presented at trial, the district court did not err in finding that Huntsman proved by a preponderance of the evidence that it lost sales as a result of Praxair's breach of contract.

*Award for lost profits*

To support this argument, Praxair again contends that adopting the jury's damages award was legal error by the district court because Huntsman provided no definite proof, and that Huntsman's claims were premised on its self-serving assertions that it sold every pound of aniline or MDI that it produced. Further, Praxair argues that even assuming that Huntsman did sell everything it produced, Huntsman could not prove with certainty which products would be in demand by spot sales customers—meaning an accurate contribution margin could not be ascertained. Praxair asserts that without this accurate calculation, Huntsman's claims are merely speculative in nature; therefore, Huntsman is not entitled to damages. Alternatively, Praxair avers that the jury was incapable of reaching any conclusions in such a complex case without the aid of an expert. Because the only economic damages expert testimony that was offered was that of Ms. Szelc and her damages calculation for MDI and aniline was approximately $37.5 million, the jury erred by straying from that calculation in its award. As a result, Praxair argues that this Court should reduce the damages award to match the figures provided by Ms. Szelc.

In opposition, Huntsman asserts that the jury award was not manifestly erroneous because the jurors were free to use their common sense to reject all or part of Ms. Szelc's testimony. Huntsman points out that all of its witness testimony adduced at trial, including that of Ms. Szelc, indicated that Ms. Szelc's calculation of contribution margins used an extremely conservative approach. Further, according to Huntsman, this witness testimony indicated that the gas supply interruptions caused by Praxair did not affect any sales to contract customers, so any lost profits necessarily would have been related to a lost opportunity to sell MDI to spot customers, which generally had higher contribution margins. Therefore, Huntsman argues, it was within the jury's purview to discard the contribution margins provided by Ms. Szelc that included contribution margins for contract sales. We are persuaded by Huntsman's position.

We previously noted that at trial Ms. Szelc explained her lost profits formula—the pounds of lost production of MDI and aniline that would have resulted in lost spot sales multiplied by the appropriate contribution margin.[7] She broke this down into a three-step process: (1) determining what Huntsman could not produce as a direct result of having its supply of gases interrupted; (2) determining out of that lost production, what could be attributed to lost sales; and (3) determining the contribution margin to be applied. In discussing the proper contribution margin to be applied, Ms. Szelc acknowledged that spot customers paid more for MDI and were the more profitable customers, making up one-third

_____

[7] Ms. Szelc calculated that Huntsman lost 97,675,259 pounds of lost production of MDI and 32,104,609 pounds of lost production of aniline.

21

of Huntsman's total sales; however, because she used a weighted average contribution margin, which consisted mostly of contract sales, the resultant contribution margin would be lower. Ms. Szelc was probed as to whether she considered her damages model to be conservative, to which she responded, "Yes, I do, based on how the plant was running throughout this time period." When questioned as to why she would use an average of contribution margins, Ms. Szelc explained:

> Because we don't know exactly what products they didn't produce or sell at that period of time. We don't know every flavor and the quantity of every flavor that was sold, so you have to look at what's the best or the fairest representation of what that contribution margin would have been, and so to use the average of that product mix, that's what we call it, a product mix, the mix of flavors that you sold in that month at the volumes you sold them in that month, and I did that for the month that they lost the sales in. I looked at what that was overall as an average, and if anything that's going to under-represent those losses.

Ms. Szelc than agreed that because the data she used in her calculations indicated that Huntsman had been able to meet its obligations to its contract customers, the lost profits due to lost sales would be comprised of spot sale customers. She further explained that:

> The spot customers they're coming to you because they need it, they need it now, and they - now, sometimes they have times in the future or sometimes they're being opportunistic, they know you have a little bit more and they're going to buy it and get it a little cheaper, but on average, spot customers are going to pay more for the MDI. They're your more profitable customers. And so since I used a weighted average, and we've already heard that most of the sales that got turned away were spot customers, by definition that weighted average contribution margin is going to be made up of mostly contract sales so it will be at a slightly lower or—it's going to be at a lower contribution margin.

Finally, when Ms. Szelc was asked whether her total damages calculations were closer to the ceiling or the floor of lost profits damages, she expounded that:

> Because of all the things we've spoken about where I made conservative determinations, the margin that I [u]sed the fact that my damages claim for example doesn't capture the long-term impact of turning customers away, I would say this is much closer to the floor than the ceiling.

*The jury's determination*

All of this testimony was before the jury when it went in to deliberate whether Huntsman had first proven that it lost sales and, if so, to what amount of damages it was entitled. In contrast, on day eleven of the trial,[8] as we previously noted, Praxair attempted to tender Dr. Weisenberger as an economic damages expert in order to challenge Ms. Szelc's damages model, but the district court rejected him as an expert on that basis. However, Praxair did not attempt to qualify another economic damages expert before the trial concluded nor does the record reflect that Praxair sought supervisory review of the exclusion of its tendered expert witness. Consequently, the jury had no expert testimony elicited from any of Praxair's witnesses to either refute Ms. Szelc's damages model generally or challenge that the model was conservative and admittedly underestimated Huntsman's lost profits.

Praxair insists that in a complicated case such as this one, jurors are unable to reach a proper calculation of damages without the aid of expert testimony. Next, Praxair argues that the jury lacked the required technical knowledge and skill

---

[8] Although the trial spanned a three-week period, there was a total of thirteen actual trial days. The first two days were reserved for jury selection, while day thirteen was designated for closing arguments of counsel.

to be able to apply the correct contribution margin to each and every lost pound of production. Further, Praxair asserts that the jury was unable to understand the spreadsheets entered into evidence and used by Ms. Szelc in her calculations. We disagree.

First, the testimonial transcripts of Ms. Szelc reflect that she carefully explained to the jury her methodology—the three-step-process—by which she derived her lost profits calculations. In addition, together with the jury, Ms. Szelc reviewed the various spreadsheets she used to render her calculations, explaining to the jurors in detail what the differing columns represented and how to interpret the numerous abbreviations. Moreover, the record indicates that this particular jury was somewhat sophisticated. Eleven of the twelve jurors agreed to the lost profits damages amount—at least four of those eleven jurors possess college degrees, including an accountant and a registered nurse.

Next, Praxair makes much of the fact that the jury sent a handwritten note requesting some clarification from the presiding district judge about two of the joint-exhibit spreadsheets, namely JX 1048 (showing the products produced at the Geismar facility and the corresponding contribution margins) and JX 1025 (showing the contribution margin for aniline). Rather than answering the jury's questions, the district court instead referred them back to their trial notes for clarification. It is significant, however, that the jury posed no questions about any other of Huntsman's's complex exhibits—particularly 2118, a spreadsheet that shows all of Ms. Szelc's calculations for lost profits; 2115, a spreadsheet that

reflects Ms. Szelc's calculations for lost sales for MDI; or 2116, a spreadsheet showing lost sales for aniline.

"In reviewing a jury's factual conclusions with regard to special damages, [such as loss of profits,] an appellate court must satisfy a two-step process based on the record as a whole: [(1)] there must be no reasonable factual basis for the [district] court's conclusions, and (2) the finding must be clearly wrong." *Marable v. Empire Truck Sales of La., LLC*, 16-0876, 0877, 0878, p. 36 (La. App. 4 Cir. 6/23/17), 221 So.3d 880, 905 (first citing *Kaiser v. Hardin*, 06-2092, pp. 11-12 (La. 4/11/07), 953 So.2d 802, 810; and then citing *Guillory v. Ins. Co. of North Am.*, 96-1084, p. 5 (La. 4/8/97), 692 So.2d 1029, 1032). "A party's own detailed testimony as to his loss may be sufficient to support an award for loss of profits." *First Alarm*, 47,283, p. 7, 114 So.3d at 1172 (citing *Rosbottom v. Office Lounge, Inc.*, 94–894 (La. App. 3d Cir.4/5/95), 654 So.2d 377.). Furthermore, "while the lost profit award may not be based upon speculation and conjecture, 'the absence of independent, corroborating evidence may not be fatal to the plaintiff's burden of proof.'" *Raphael v. Raphael*, 05-1403, p. 5 (La. App. 3 Cir. 5/3/06), 929 So.2d 825, 828 (quoting *J.B. Talley & Co., Inc. v. Vilaret Const. Servs., Inc.*, 98-395, p. 11 (La. App. 3 Cir. 10/7/98), 722 So.2d 9, 14).

It is well-settled that "[q]uestions of credibility are for the trier of fact, even when applied to expert testimony." *Johnston v. Vincent*, 21-01196, p. 29 (La. 2/1/23), 359 So.3d 896, 916 (citing *Ryan v. Zurich Am. Ins. Co.*, 07-2312, p. 12 (La. 7/1/08), 988 So.2d 214, 222). "The trier of fact may accept or reject any

25

expert's opinion, in whole or in part, and may substitute its common sense and judgment for the expert's opinion when the substitution appears warranted on the record as a whole." *Id.* "Indeed, the concept that a court must accept wholesale an expert's testimony runs contrary to the policy favoring discretion to district courts in admitting expert testimony." *Id* (citations omitted). "Broad latitude is given in proving lost profits because this element of damages is often difficult to prove and mathematical certainty or precision is not required." *Cargill, Inc. v. Syngenta Seeds, Inc.*, 21-681, p. 10 (La. App. 5 Cir. 12/7/22), 355 So.3d 103, 110 (quoting *Brecheen v. News Grp., L.P.*, 11-1173, p. 28 (La. App. 5 Cir. 12/11/12), 105 So.3d 1011, 1029-30). "'The trier of fact must be afforded much discretion in the determination of such damages[.]'" *Id.*, 21-681, p. 13, 355 So.3d at 113 (quoting *Clark v. Ark-La-Tex Auction, Inc.*, 593 So.2d 870, 878-79 (La. App. 2 Cir. 1992)).

In truth, neither the district court nor this Court are privy to the deliberations of the jury. Therefore, we cannot speculate as to what factors weighed heaviest with the jurors to use an average of the top one-third contribution margin from the spreadsheet to reach their conclusion that the damages award they almost unanimously agreed upon was the most equitable under the circumstances. It is clear, however, that the jury found Ms. Szelc to be credible when she repeatedly told them that her calculations were extremely conservative. Her testimony was further corroborated by that of Mr. Jennings, who had been instrumental in painstakingly assembling the data Ms. Szelc used to make her calculations. Together with the spreadsheets that were in the record for the jury to consider, we

find that there was ample evidence for the jury to accept Ms. Szelc's methodology but reject her weighted average contribution margin, which included contract sales. Consequently, we find that there was a reasonable factual basis for the jury's conclusion and that their damages award was not clearly wrong.

*Assignment of error No. 3—Motion for new trial*

Praxair avers that the district court abused its discretion in denying its motion for new trial on the basis of newly discovered evidence, which requires a new trial. Louisiana Code of Civil Procedure article 1972(2) provides, in pertinent part, that "[a] new trial shall be granted, upon contradictory motion of any party . . . [w]hen the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial." In this instance, Praxair's newly discovered evidence were affidavits attached to its motion, which offered the sworn statements of Praxair's Commercial Director, John Fogarty ("Mr. Fogarty") and an economist, Charles Finch ("Mr. Finch"). Mr. Finch largely attested that Huntsman's closing statement presented a new damages model to the jury—raising again, in so many words, Praxair's trial by ambush argument.

Having already determined that there was no trial by ambush, we find Mr. Finch's affidavit to be unpersuasive and that it does not qualify as newly discovered evidence. Further, as the district court pointed out, Mr. Fogarty was present for the entire trial but was never called as a witness. Accordingly, his assertions, very similar to Mr. Finch's, do not constitute newly discovered

27

evidence. Therefore, we find that the district court did not abuse its discretion when it denied Praxair's motion for a new trial.

## DECREE

For the foregoing reasons, finding no manifest error, we affirm the district court's July 12, 2022 judgment.

**AFFIRMED**